Rufus STOKES, Appellant,

v.

Courtland C. PEYTON, Superintendent of the Virginia State Penitentiary, Appellee.

No. 13233.

United States Court of Appeals, Fourth Circuit.

Argued March 6, 1970.

Decided June 4, 1970.

Beverley L. Crump, Richmond, Va. (Court-assigned) [Christian, Barton, Parker, Epps & Brent, Richmond, Va., on brief], for appellant.

Reno S. Harp, III, Asst. Atty. Gen. of Va. (Andrew P. Miller, Atty. Gen., on brief), for appellee.

Before SOBELOFF, BOREMAN and BUTZNER, Circuit Judges.

SOBELOFF, Circuit Judge:

Rufus Stokes appeals from the denial of his petition for a writ of habeas cor-

pus. For reasons to be developed, we agree with petitioner that he is entitled to relief and we reverse.

Earl Prince and Rufus Stokes were enemies of long standing. Rosetta Monroe was Prince's paramour and the mother of his 14-year-old daughter, Cecelia Prince, but apparently she had also, at one time, carried on a relationship with Stokes. This was the source of friction between the two men. Stokes had been attacked twice by Prince—on one occasion he was cut in the leg; on the other he was hit in the head with a brick. Finally, on June 28, 1963, an altercation at the home of Rosetta Monroe resulted in Prince's death. Stokes' story—then and now—is that he killed Prince in self-defense and only after extreme provocation. He says that Prince, who was staying with Rosetta Monroe at the time, called out to him as he passed the house and insisted that Stokes come in. According to Stokes, he entered, reluctantly, and as soon as he did Prince began to curse and taunt him. Prince then assaulted Stokes with a knife and in the ensuing fight Prince was fatally stabbed. Cecelia Prince, the sole eyewitness to the entire incident, claimed that the killing was deliberate.[1] Her version was accepted and he was arrested and indicted for first degree murder.

The defendant, then 48 years old, had only a fourth grade education and was barely literate. As an employee of the Richmond sanitation department for 13½ years, his savings amounted to $382 in an employee credit union. Thus it was not surprising that on the eve of

his trial, he was still unrepresented. Finally, on September 19, 1963, the morning before the trial, Stokes retained attorney Thomas Crouch.[2]

That day Crouch talked with Stokes at the jail for thirty minutes to an hour. A major theme of the conversation was settling on a fee ($300) and executing an assignment of the credit union funds. Crouch heard Stokes' account and received the names of the three people who were at the Monroe house on the day of the killing: Rosetta Monroe, Cecelia Prince, and Irene Bostick.

After the interview with his client, the attorney made his investigation. He could not locate Bostick but this, he later testified, did not trouble him since, although Bostick was present when Stokes arrived, she had left before the fight. Crouch was under the impression that her testimony would only have corroborated the fact that Stokes was invited in. Thus he reasoned that her testimony would not be helpful and would tend to negate the existence of hostility between the men. Crouch did talk to Monroe and Prince, whose testimony promised to be severely damaging.

The next morning, the day of the trial, Crouch saw Stokes for ten minutes. He reported to Stokes the unhappy results of his investigation and advised petitioner that his only hope lay in his own testimony.

The case was called and Crouch did not ask for a continuance. As he saw it, "having no other witnesses available I could see where it would serve no purpose whatsoever." This explanation

1. The narrative statement of the evidence—itself an object of petitioner's attack, *infra*—has Cecelia testifying that all of a sudden in the midst of a friendly conversation Stokes jumped up, declared, " 'I have been wanting to kill you for a long time' and with this statement started stabbing [Prince] in the stomach and on the back." This contrasts with the report of the medical examiner which reveals no stomach wound.

2. We have little information on the circumstances leading to the late retention

of Crouch. According to Crouch, about a month or month and a half before he was finally retained, he received a call from Nancy Jeter, on behalf of her uncle, Stokes. Crouch told her that if Stokes "wanted me to represent him to let me know and I would come to see him." He next heard two or three weeks later when Mrs. Jeter called to tell him that she did not know what Stokes would do. Finally, on September 19, Mrs. Jeter called and said that Stokes wanted Crouch to represent him.

contrasts with the recollection of Monroe that Crouch told her that he could do little in aid of Stokes since "Stokes didn't give him much notice." No court reporter was provided. Stokes' counsel made no move to obtain one, either at public expense or with the remainder of Stokes' savings.

The result was that on that very day, September 20, Stokes went on trial for his life under highly adverse conditions. Arrayed against him was the testimony of the victim's girl friend and daughter; on his side there was only his word. He had no witnesses to corroborate his account of the prior violent episodes between him and the victim, or the circumstances of the killing itself. He was furnished no means of accurately recording what happened in the courtroom.

Stokes was convicted and sentenced to life in prison. He desired to appeal and relayed the message to Crouch. The attorney responded that Stokes had no grounds upon which to base an appeal and that, at any rate, "the cost of appeal to the Supreme Court would be many times more than you have paid for the defense in the Hustings Court." Persevering, Stokes tried to perfect an appeal on his own. Unfortunately, however, his papers did not comply with formal requirements. Consequently, before the error could be rectified time ran out and the appeal was not allowed.

Petitioner initiated post-conviction litigation that same year. In 1966 the Supreme Court of Appeals of Virginia agreed that Stokes had been denied his right of appeal, although it found the assistance of counsel not inadequate. Stokes v. Peyton, 207 Va. 1, 147 S.E.2d 773 (1966). A belated appeal was granted and the case remanded to the trial court to appoint counsel and to "furnish him with a free transcript or narrative of the evidence and other necessary papers for an appeal * * *."

The court specified that "[i]f these procedures cannot be complied with, then the defendant, Stokes, shall be granted a new trial, or be released from further custody." 147 S.E.2d at 777.

Of course a transcript was unavailable since there were no notes to be transcribed. Instead, a three-page narrative statement of the trial was supplied, consisting of cursory distillations of witnesses' testimony. This was prepared by the prosecutor two years and nine months after the trial from his own recollections, from conversations with Mr. Crouch, and from pre-trial records in the prosecutor's file, including reports given to the police. It contains no complete, accurate record of objections and motions.[3] The trial judge had no notes, and, without holding a hearing as requested, simply adopted the tendered statement notwithstanding the objection of petitioner's newly-appointed counsel that it was a woefully inadequate basis for appeal. Petitioner pressed his objection in the Virginia high court, but that tribunal affirmed the conviction without opinion.

Stokes has now turned to the federal courts for relief. He repeats the contention he made before the state courts, that the three-page narrative made his belatedly granted right of appeal illusory, and that it failed to fulfill constitutional standards for the provision to indigent appellants of a "record of sufficient completeness." He also argues that the performance of his trial counsel was constitutionally inadequate. We agree with both of his contentions.

## I

### *The Narrative Statement*

In Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), it was established that the appellate review granted an indigent must equal

---

3. There is no list of objections made during the course of the trial. The narrative reveals only that three motions were made at the close (judgment contrary to law and evidence; prejudiced witnesses for Commonwealth; excessive punishment) and that they were all denied. At the post-conviction hearing, Crouch could not recall whether or not he had moved to have the judgment set aside.

that afforded a solvent defendant. This means, as in *Griffin*, that a poor man must have as complete and useful a record of the evidence as the man who can purchase a transcript. Eskridge v. Washington State Board, 357 U.S. 214, 78 S.Ct. 1061, 2 L.Ed.2d 1269 (1958). It has also come to mean that a defendant cannot be denied an appeal solely because he lacks the funds to retain an attorney to prepare one. Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L. Ed.2d 811 (1963).

The Supreme Court of Appeals of Virginia, in accordance with these principles, has recognized that Stokes was wrongfully denied his appeal since he was without assistance of appellate counsel. Petitioner argues that having been denied initially *any* review, because of the absence of counsel, he was ultimately denied *effective* review on his belated appeal since it was impossible at that late date to provide a sufficient record.

Draper v. Washington, 372 U.S. 487, 83 S.Ct. 774, 9 L.Ed.2d 899 (1963), furnishes us the proper guide. In that case the Supreme Court measured the adequacy of the record supplied to defendants against the standards announced in *Griffin* and *Eskridge*. Defendants had moved for a free transcript. The state opposed the motion and offered an affidavit embodying the prosecutor's narrative version of the evidence. A hearing was held at which the defendants and their former counsel were afforded an opportunity to develop objections. Afterwards, the judge denied the motion, setting forth the facts he found had been proven at trial. All of the materials—the affidavit, the transcript of the hearing, and the judge's findings—were before the state appellate court on review of the convictions.

In the Supreme Court all agreed that a verbatim transcript was not a necessity in every case.

"In considering whether petitioners have received an adequate appellate review, we reaffirm the principle, declared by the Court in *Griffin,* that a State need not purchase a stenographer's transcript in every case where a defendant cannot buy it. 351 U.S., at 20, 76 S.Ct., at 591. Alternative methods of reporting trial proceedings are permissible if they place before the appellate court an equivalent report of the events at trial from which the appellant's contentions arise. A statement of facts agreed to by both sides, a full narrative statement based perhaps on the trial judges minutes taken during trial or on the court reporter's untranscribed notes, or a bystander's bill of exceptions might all be adequate substitutes, equally as good as a transcript." 372 U.S. at 495, 83 S.Ct. at 779, 9 L.Ed.2d 899.

The dissent argued that, taken altogether, the materials before the state court sufficed. The majority, however, declared that

[t]he materials before the State Supreme Court in this case did not constitute a "record of sufficient completeness," see Coppedge v. United States, 369 U.S. 438, 446 and p. 498, 82 S.Ct. 917, 921, 8 L.Ed.2d 21, *infra,* for adequate consideration of the errors assigned. No relevant portions of the stenographic transcript were before it. The only available description of what occurred at the trial was the summary findings of the trial court and the counter-affidavit filed by the prosecutor. The former was not in any sense like a full narrative statement based upon the detailed minutes of a judge kept during trial. It was, so far as we know, premised upon recollections as of a time nearly three months after trial and, far from being a narrative or summary of the actual testimony at the trial, was merely a set of conclusions. The prosecutor's affidavit can by no stretch of the imagination be analogized to a bystander's bill of exceptions. The fact recitals in it were in most summary form, were prepared by an advocate seeking denial of a motion for free transcript, and were contested by peti-

tioners and their counsel at the hearing on that motion. 372 U.S. at 497, 83 S.Ct. at 780, 9 L.Ed.2d 899.

■ With these criteria in mind, we turn to an examination of the record furnished Stokes. It fails to meet the *Draper* test in several respects. As in *Draper*, the narrative was not derived from the judge's detailed minutes. Rather, it was based on the prosecutor's version; indeed, in this case the accepted narrative was verbatim what the Commonwealth submitted. The interim between trial and compilation of the record was almost three years in this case, three months in *Draper*. It is one thing to be satisfied by something less than a literal transcript and to accept a reconstruction of the facts based on fresh memory. It is quite another to permit such an expedient after considerable time has elapsed.[4] Moreover, the narrative in this case is not, in a true sense, a "report of the events at trial," 372 U.S. at 495, 83 S.Ct. at 779, 9 L.Ed. 2d 899, since it was synthesized by reference to various pre-trial documents that may or may not accurately reflect the evidence actually adduced.

The present record does not even approach the completeness of the one disapproved in *Draper*. There the trial judge conducted a full hearing and incorporated into the record proffered objections and additions to the prosecutor's account. As a consequence the record came to include a description by the defendants' former attorney of the errors claimed to have been made at the trial. The judge then added his own findings. Here, by contrast, the record consists of the prosecutor's account, standing alone, having been accepted without hearing and without comment. Thus it is quite apparent that this record would not even have satisfied the

more lenient standard embraced by the dissenters in *Draper*.

In short, the record does not put the appellate court in a position to make a rational assessment of the petitioner's substantive contentions. Stokes asserts that no willfulness, deliberateness or premeditation was proven, and he attacks the opposing witnesses as prejudiced. There is, on this record, no way to weigh the probity of their testimony. The narrative contains mere abstracts of their stories. It does not reveal how they fared under cross-examination and omits all reference to Rosetta Monroe's relationship to the two men, brought out by Crouch, according to his post-conviction hearing testimony. Thus we must conclude, as did the Supreme Court in *Draper*, that the narrative does "not constitute a 'record of sufficient completeness' * * * for adequate consideration of the errors assigned." 372 U.S. at 497, 83 S.Ct. at 780, 9 L.Ed.2d 899.

Norvell v. Illinois, 373 U.S. 420, 83 S. Ct. 1366, 10 L.Ed.2d 456 (1963), does not militate against this result. In that case an indigent defendant was convicted in 1941 and was denied a free transcript at the time. He did not pursue his appeal. Later, after the decision in *Griffin*, Norvell renewed his quest for a free transcript. It was now, however, too late. The stenographer had died and the notes were undecipherable. Moreover, witnesses to the trial could not piece together a reconstruction. The Supreme Court denied Norvell relief, countenancing "rough accommodations" where "through no fault of the State, transcripts of criminal trials are no longer available." 373 U.S. at 424, 83 S.Ct. at 1368, 10 L.Ed.2d 456. In doing so, the Court emphasized that the right to a transcript is by nature incident to

---

4. Petitioner has graphically demonstrated the dangers of the belatedly prepared narrative. Public records show that the trial judge heard perhaps as many as 2688 cases in the almost three year period between Stokes' trial and certification of the statement. There are also several particular indications that the narrative is not wholly reliable. It omits any mention of cross-examination of Rosetta Monroe on her relationship to the two men. The address of the crime given in the narrative conflicts with that elicited in the post-conviction hearing.

appeal and limited its holding "to those who, at the time of the trial, had a lawyer and who presumably had his continuing services for purposes of appeal and yet failed to pursue an appeal." 373 U.S. at 423, 83 S.Ct. at 1366, 10 L.Ed.2d 456. The situation before us was expressly put aside. The Court noted that

> [i]f it appeared that the lawyer who represented petitioner at the trial refused to represent him on the appeal and petitioner's indigency prevented him from retaining another, we would have a different case. 373 U.S. at 422, 83 S.Ct. at 1368, 10 L.Ed.2d 456.

Moreover, the *Norvell* decision was intended to mitigate the rigors of an uncompromisingly retroactive application of *Griffin*. In 1941 when the defendant was denied a transcript, the state was constitutionally blameless. Sometime after the 1956 *Griffin* decision, when Norvell pressed the point, it had become impossible to rectify the deprivation, also without the state's fault. Obviously the "rough accommodations" mentioned in *Norvell* are not in order in the concededly different circumstances found here.

## II

### *The Assistance of Counsel*

This court has often held that an interval of only one day or less between employment of an attorney and the trial raises a presumption that effective assistance of counsel was not afforded. Twiford v. Peyton, 372 F.2d 670 (4th Cir. 1967); Martin v. Commonwealth of Virginia, 365 F.2d 549 (4th Cir. 1966); Turner v. State of Maryland, 318 F.2d 852, 854 (4th Cir. 1963); Jones v. Cunningham, 313 F.2d 347 (4th Cir. 1963). When the first meeting between lawyer and client occurs such a short time before trial,

[n]ormally in the absence of clear proof that no prejudice resulted, we should be obliged to treat the lawyer's representation as inadequate and the trial as falling short of the standards of due process guaranteed by the Fourteenth Amendment.

*Turner, supra,* 318 F.2d at 854.

■ It is true that those were cases in which the attorney was appointed by the state and not, as here, retained by the defendant. This, however, does not constitute a material difference.

■ Here, the lateness of the attorney's retention is not directly or solely attributable to the state as in the appointed counsel cases, and theoretically Stokes did have it in his power to act earlier. But it would be simplistic to dismiss petitioner's contention by using the expedient of absolving the Commonwealth and placing blame solely on Stokes' own shoulders.[5] Such an analysis would ignore the fundamental notion that the assistance of counsel goes to the roots of a fair trial. *Turner, supra;* Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). It would also ignore the precept that the right to counsel must be freely and intelligently waived. Gideon v. Wainwright, *supra;* Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). The state has made no showing that this uneducated and bewildered defendant in any sense knowingly surrendered this right.

■ Moreover, the lateness of the employment of counsel is only one facet of the evil. The other necessary ingredient is the failure to postpone the trial. It is incumbent upon an attorney to request a continuance in such circumstances, Jones v. Cunningham, *supra,* 313 F. 2d at 352, and it is incumbent upon the court to grant it, Twiford v. Peyton, *su-*

---

5. Under most standards of indigency, Stokes, with $382 to his name, might have qualified for at least some assistance in the retention of counsel in this capital case. Thus it could be argued that even under a "blame" analysis the state must bear some responsibility since it appears that during the course of the wait for trial the state authorities made no attempt to assure representation for Stokes or ascertain whether he had arranged for counsel himself.

*pra.* In this respect counsel's duty is the same whether he is retained by the client or appointed by the court. Stem v. Turner, 370 F.2d 895 (4th Cir. 1966).

Petitioner, then, deserves relief from the effect of his premature trial unless the Commonwealth can overcome the prima facie case and affirmatively demonstrate an absence of prejudice. On the contrary, not only has the Commonwealth failed to carry its burden, but Stokes has demonstrated that very likely he was seriously harmed.

As Crouch recognized, Stokes' prospects lay in establishing self-defense or at least in negativing premeditation by showing provocation. To do this, two avenues of inquiry were highly relevant: the history of violent confrontations with the victim and the circumstances leading up to the killing on the fateful day itself. Of these, Crouch pursued one not at all, the other only feebly.

Irene Bostick was present when Earl Prince called Stokes to enter the Monroe house. Considering the nature of Stokes' defense, it was critically important for counsel to explore this woman's recollection of the events. Coles v. Peyton, 389 F.2d 224, 227 (4th Cir. 1968). But in the one afternoon available for investigation, Bostick could not be located. Crouch's surmise that she would have been of no help could not be justified without actually finding out what she had to say. At any rate we are confident that had there been more time for preparation, counsel would not have left this stone unturned before proceeding to trial.[6]

Crouch made no effort at all to corroborate Stokes' account of his history of trouble with the victim. That such corroboration existed is shown by the ease with which post-conviction counsel uncovered proof to the effect that "Earl Prince rode [Stokes'] back right much"[7] and had physically attacked Stokes twice. No doubt, given adequate time trial counsel would also have developed the highly material evidence.

As we have said, "[o]f course, it is not for a lawyer to fabricate defenses, but he does have an affirmative obligation to make suitable inquiry to determine whether valid ones exist." Jones v. Cunningham, *supra*, 313 F.2d at 353. Stokes' case was not without promise. It was, however, without adequate preparation. Under the circumstances, we cannot conclude that the representation he had in the proceedings leading to his conviction and resultant detention met the constitutional minimum.

For the reasons stated, we reverse and direct the District Court to issue the writ of habeas corpus. The effectiveness of the order shall be stayed for 60 days from the date of this opinion to permit a new trial if the Commonwealth so elects.

Reversed.

---

6. To this date we do not know precisely what Bostick would have said. This is because at the state post-conviction hearing, at which most of the facts were developed, the Commonwealth insisted that neither Bostick nor Stokes should be allowed to testify as to what Bostick saw. Counsel for Stokes, intending to show that Bostick could testify "that the victim incited this and * * * brought it on himself," countered that Bostick "was a very material witness." However, the court sustained the Commonwealth's objection. Thus this critical portion of the inquiry was blocked.

Our ignorance on this point, however, does not prevent us from reaching a decision at this juncture. Stokes has certainly established a possibility of prejudice in this respect, and as we have said, it is for the Commonwealth to prove the lack of prejudice. As in Twiford v. Peyton, 372 F.2d 670, 673 (4th Cir. 1967), Bostick "may have provided a basis" for the defense. There it was held that "[t]he inability of counsel even to consider this woman as a witness because of the late time of his appointment was manifestly prejudicial."

7. Testimony of Elizabeth Randolph.