John W. McLAUGHLIN

v.

M. L. ROYSTER, Superintendent of the Virginia State Farm.

Civ. A. No. 5667–R.

United States District Court,
E. D. Virginia,
Richmond Division.

July 25, 1972.

Francis M. Fenderson, Jr., Richmond, Va., for plaintiff.

Vann H. Lefcoe, Asst. Atty. Gen. of Virginia, Richmond, Va., for defendant.

## MEMORANDUM

MERHIGE, District Judge.

Petitioner, herein, who has for the past several years been one of the more prolific writ-writers, comes before the Court on his primary complaint of a conviction rendered by the Circuit Court of Roanoke County, Virginia, under date of November 14, 1962, wherein he was, upon a plea of guilty, found guilty of first degree murder and sentenced to life imprisonment.

Having concluded by memorandum filed January 13, 1971, copy of which is attached hereto as an appendix to this memorandum, that petitioner had fully exhausted his State remedies, the Court now addresses itself to the merits of petitioner's habeas corpus claim. The Court has considered the transcript of the State court hearing and has, in addition thereto, conducted a plenary hearing.

The primary issue before the Court centers around the plea of guilty entered by petitioner. The facts disclose as follows:

Petitioner was charged with the murder of his estranged wife. Shortly after his arrest, upon motion of the Commonwealth's Attorney, petitioner was admitted to Southwestern State Hospital, Marian, Virginia, where he remained for a period in excess of 130 days. The conclusion of the examining physicians at the State mental hospital was to the effect that McLaughlin was competent to stand trial. Indeed, there seems to be no doubt but that the purpose of the State's motion for his confinement at the mental hospital was to insure against any subsequent claim that McLaughlin was insane at the time of the alleged offense. At the very least, the conclusions of the physicians, while seemingly precluding any such effective defense, give rise to such a defense. At least one of the doctors found McLaughlin to be a potential suicide and a person suffering from acute alcoholism.

The facts adduced at the several hearings show that the plea of guilty was made solely upon the decision of the petitioner himself. McLaughlin, who had had several minor brushes with the law arising primarily from his marital difficulties, sought the assistance of an attorney who was well acquainted with McLaughlin by reason of his having represented him in those difficulties. Shortly after McLaughlin's arrest and prior to McLaughlin's being sent to the Southwestern mental hospital, the attorney, upon conferring with him at the Roanoke County Jail, advised McLaughlin that he would accept employment on receipt of a fee of Five Thousand ($5,-000.00) Dollars. Subsequent to this meeting, McLaughlin by order of court was sent to the mental hospital. The then prospective attorney was not advised of these proceedings. Upon being returned from the hospital McLaughlin once again conferred with the attorney

who, while not receiving the requested fee, agreed to, as he put it, stand by the petitioner.

In the interim, petitioner had addressed a letter to the judge of the county court requesting the appointment of counsel. The record does not disclose any action having been taken on that request. The evidence discloses, however, that the Commonwealth's Attorney and the trial judge were both under the impression that McLaughlin was represented by counsel. That representation however was, according to counsel's own testimony, a limited one. Indeed, counsel's position was that had he been employed, as he put it, he would have handled the matter differently. It was his position that his services were limited to negotiating to the extent that McLaughlin, who was in extreme fear of the death penalty, would receive a life sentence.

The Court finds that no investigation was made by the attorney, although there were avenues of investigation which were required. The attorney quite frankly stated that had he "been employed and paid to represent McLaughlin, he would have proceeded in the case differently. Not as he requested me to do. I would have proceeded differently with it. I would have interviewed more people, for instance." The practical result of McLaughlin being unable to raise the required fee was that he was represented in a first degree murder case by one who was marked as counsel of record but who considered his responsibility to be limited solely to a negotiation for a life sentence. Indeed he waived preliminary hearing and indictment and was tried on a warrant charging first degree murder.

The issue before the Court is whether McLaughlin, who the Court finds was literally paralyzed with fear of the death penalty, can be said to have acted voluntarily when he seized the better of two grim alternatives which the State extended to him.

The Court finds that his counsel of record in an effort to alleviate the concern expressed by McLaughlin, expressed to McLaughlin the fact that the State Judge had, prior to trial, agreed to concur in the recommendation of the Commonwealth's Attorney that upon a plea of guilty he would be sentenced to life imprisonment.

■■ It appears to this Court that the primary foundation upon which rests the rule that a voluntary guilty plea is not subject to attack is that a defendant entering such a plea does so assisted and informed by adequate counsel. The constitutional requirement is not satisfied upon a perfunctory appearance by counsel who does nothing whatever before or during trial to advise a client or to protect his rights except to acquiesce with the client's wishes. Perfunctory or hand-holding representation is simply not consistent with the right to counsel. See Turner v. Maryland, 303 F.2d 507 (1962); Jones v. Cunningham, 297 F.2d 851 (1962). A client's professed desire to plead guilty is not the end of an attorney's responsibility. See Fields v. Peyton, 375 F.2d 624 (4th Cir. 1967); Martin v. Commonwealth, 365 F.2d 549 (4th Cir. 1966). See also, Ware v. Cox, 324 F.Supp. 568 (E.D.Va.1971). When a defendant convicts himself in open court the Constitution recognizes that the critical stage of adjudication has proceeded for the most part outside the courtroom. That process contemplates the pursuit by counsel of factual and legal theories in order to reach a conclusion as to whether a contest would best serve the attorney's client's interest. In short, effective representation when a guilty plea is contemplated to a great extent entails affirmative action on the part of counsel. The facts adduced before this Court demonstrate more than a mere possibility that investigation by counsel might well have unearthed favorable evidence. Such possibility, standing alone, is a sufficient showing of prejudice.[1]

1. Stokes v. Peyton, 437 F.2d 131 (4th Cir. 1970).

█ McLaughlin's counsel stated at the State post-conviction hearing that had he been aware of the facts which emerged there concerning his client's mental state he would have given consideration to a possible insanity defense. Indeed, the evidence discloses that there was a fairly substantial family history of mental instability not only as to McLaughlin himself, but as to his brother and other members of his family. It is, in this Court's opinion, immaterial that counsel was not court appointed, for retained counsel are subject to the same fundamental constitutional requirement of effectiveness. See Stern v. Turner, 370 F.2d 895 (4th Cir. 1966). It is not fatal to petitioner's claim that he may, indeed did, insist to his counsel that he wished only to plead guilty in exchange for a life sentence. The mere securing of the sought after bargain does not fulfill counsel's duty in such a case, for to so rule would be to reduce the role contemplated by the Constitution to that of a messenger, and to cast the responsibility for the fairness of the entire proceeding upon the individual defendant who the law recognizes is most in need of assistance.

The Supreme Court has recognized that even an intelligent and educated layman has small and sometimes no skill in the science of law. Indeed he frequently lacks both the skill and knowledge adequate to prepare a defense even though he may have a perfect one. "He requires the guiding hand of counsel at every step of the proceedings against him." See Powell v. Alabama, 287 U.S. 45, 69, 53 S.Ct. 55, 64, 77 L.Ed. 158 (1932); Argersinger v. Hamlin, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (June 12, 1972). If, as the United States Supreme Court has said, it be true of men of intelligence that they lack the ability to establish their innocence, it is even more a truism that the danger exists more profoundly for a person such as McLaughlin who was literally paralyzed with fear of the electric chair, and whose mental condition was so suspect that the State kept him under observation for more than four months. Coupled with McLaughlin's fear of the electric chair is the fact that he was told by his attorney friend that he would "stick by him purely because he wanted me to do it, and with the understanding of the sentence that he would receive and that there wouldn't be any trial." Indeed, the evidence discloses that McLaughlin's mental condition was such that even after he had received the life sentence and was transported to the State Penitentiary, the psychiatrist there who saw him some three days after his admittance described him as confused and delusional. The psychiatrist, Dr. Brick, testified that McLaughlin even then thought he was going to be electrocuted, "and we tried to convince him that he was not going to be electrocuted, and that he was in the hospital, but we couldn't convince him." The evidence discloses that subsequently McLaughlin was returned for an additional 120 days to the State mental hospital.

█ We deal here not with a situation where a defendant is precluded from complaint by virtue of his refusal to assist his lawyer in discovering evidence which he later claims would have been favorable; our situation is quite different, for we are asked here by the State to conclude that an attorney can properly abandon all possible lines of inquiry simply because his client proves unhelpful. One of the primary functions and responsibilities of a lawyer in a criminal case encompasses the provision of dispassionate advice. It encompasses the advice of an intelligent, informed mind. Experience shows that when facing a criminal charge, even educated, sophisticated persons may well become incapable of calculating the wisest course. It is especially at such times, and it falls upon the lawyer the duty to see to it, that any advice in crucial defense, by whomsoever made, attorney or client, will be the result of a thorough investigation. The performance of this duty is crucial to the fairness of the trial, and the State cannot be heard to justify an unfair procedure by tracing it in part to

the derelictions of the petitioner. See Stokes v. Peyton, *supra*. There is no doubt that McLaughlin may well have been of little help to counsel in preparing the case, but other sources of data were available. This Court holds that it was counsel's duty to seek them out, for McLaughlin's frightened and panicky determination to plead guilty cannot be regarded as an intelligent, much less an informed, waiver of his Sixth Amendment right to such aid, and this is especially true where there is, as in the instant case, a question of his competency to stand trial as well as his competency at the time of the alleged offense.[2]

There was evidence before both the State habeas court and this court that one or more of the State doctors felt when they examined McLaughlin that he was malingering. There is no suggestion, however, of that in the testimony of Dr. Brick, who saw him within several days of his admittance to the Virginia State Penitentiary. Indeed, Dr. Brick testified that McLaughlin's actions were such that he did not consider him responsible for them at that time.

■ This Court finds that McLaughlin's mind was so crippled by fear of the electric chair that he could not understand the proceedings which resulted in his sentence, nor could he have conferred intelligently about the case. Such a person cannot be said to be competent to intelligently and knowingly plead guilty. For a guilty plea to be effective, it must be intelligently and knowingly made by a competent individual based on a rational knowledge of available alternatives. Any such plea must be an intelligent act done with sufficient awareness of the relevant circumstances and likely consequences. McMann v. Richardson, 397 U.S. 759, 766, 90 S.Ct. 1441, 25 L.Ed. 2d 763 (1970). The United States Supreme Court has insisted that a guilty plea, like any surrender of fundamental constitutional rights, must reflect the unfettered choice of a defendant. See Parker v. North Carolina, 397 U.S. 790, at 801, 90 S.Ct. 1458, 25 L.Ed.2d 785 (1969).

This Court therefore holds that the psychological effects exerted as a consequence of the fear of the death penalty coupled with the conditional acceptance of employment by his counsel were so great an influence upon McLaughlin that it must be said that he was incapable of rationally weighing the legal alternatives open to him.

■ We deal here not with a case where the good faith evaluations of a reasonably competent attorney might well be mistaken, but we deal here with a case where an attorney who, so far as the trial court knew, ostensibly was rendering to McLaughlin that degree of responsibility as any reasonably competent attorney would render, but who in fact did not feel his duties to McLaughlin were the same under the circumstances existing as they would have been had he been employed or appointed by the Court. Indeed, the attorney testified that he didn't so consider his duties in that light. His testimony, as the Court has pointed out, was to the effect that had he been employed, as he put it, his advice would have been different. The Court finds, therefore, as a matter of law, that McLaughlin's representation was ineffective. Effective representation, while not connoting perfect or faultless representation, at the very least encompasses the best effort on the part of counsel. The constitutional standard for insuring that the effective assistance of counsel is guaranteed to a defendant in a criminal action, even where an attorney may believe his client's defense is without

---

2. The evidence discloses that McLaughlin had been discharged from military service for psychiatric reasons. In addition, the diagnosis of chronic alcoholism which was made gives rise to a question of whether McLaughlin was incapable of forming and entertaining the necessary premeditated purpose to kill which might well have precluded a first degree murder conviction. See Johnson v. Commonwealth, 135 Va. 524, 115 S.E. 673.

merit, requires that he act in the role of an active advocate on behalf of his client. In Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), the Court in referring to duties of counsel in an appeal from a criminal conviction stated as follows: "The constitutional requirement of substantial equality and fair process can only be attained where counsel acts in the role of an active advocate in behalf of his client, as opposed to that of *amicus curiae* . . . . His role as advocate requires that he support his client's appeal to the best of his ability." The requirement is no less demanding at the trial level. The instant unfortunate situation is compounded by virtue of counsel's tacit admission that he did not give the case his best effort.

Concluding that McLaughlin's constitutional rights have been violated, the writ will issue.

## MEMORANDUM

This civil proceeding is in part a habeas corpus attack upon the validity of a state conviction and in part a Civil Rights Act case concerning the conditions of the convict's confinement in Virginia institutions.

### Habeas Corpus Aspects

John McLaughlin pleaded guilty to a charge of murder in the first degree in the Circuit Court of Roanoke County on November 14, 1962, and was sentenced that day to life imprisonment. He waived presentation of the charge to the grand jury and preliminary hearing and consented to arraignment on the warrant charging him with the murder of his wife on June 6, 1962. He was accompanied by counsel, and the court heard evidence before making its finding. The proceedings were transcribed.

He commenced collateral attack on the judgment by state habeas corpus in the court of his conviction. His petition alleged that he had been incompetent to stand trial; that he was denied effective representation in that his lawyer merely advised him to plead guilty, refused to contest the case unless a fee of $5,000 was paid, and failed to investigate his mental status; that the trial court failed, on written request, to appoint counsel; that the warrant on which he was tried gave insufficient warning of the charge and was otherwise defective; that he did not knowingly waive indictment and trial by petit jury and was not advised of his rights before the plea of guilty was accepted; that he was denied the chance to present witnesses on his behalf; that incriminatory statements were unconstitutionally obtained; and that a sheriff coerced him to plead guilty.

The State court conducted a hearing at which McLaughlin was represented by counsel. Relief was denied on February 6, 1964, and an appeal was noted. The petitioner assigned as error the habeas court's findings that he was competent at the time of his trial and that he received effective representation by trial counsel. On October 9, 1964, the Virginia Supreme Court of Appeals granted a writ of error to the Circuit Court's judgment.

On December 11, 1964, the petitioner signed a notarized statement requesting withdrawal of the appeal then pending before the Supreme Court of Appeals. Court-appointed counsel also filed in that court a petition for withdrawal of the appeal, reciting McLaughlin's wishes. On January 20, 1965, the court granted McLaughlin's motion and ordered the case dismissed.

Thereafter, McLaughlin petitioned the Supreme Court of Appeals for an original writ of habeas corpus. On April 26, 1967, that court issued a show cause order. McLaughlin's custodian answered, urging dismissal because the issues raised in the new petition were the same as those presented in the case which had earlier been dismissed on the petitioner's motion.

McLaughlin's direct petition alleges that some six days after his arrest, which occurred a few hours after the crime, he was sent from a Roanoke jail to Southwestern State Hospital, where he was detained 135 days. Returned to Roanoke

for trial, he alleges, he was convicted without a preliminary hearing, and after waiving indictment and jury trial, at a time when he was in a condition of insanity, which state endured until 1965. He complains as well that counsel was not appointed by the court nor employed by him but rather "counsel appointed himself 135 days after alleged crime," and that the trial was infected by perjury and prejudicial publicity.

This petition mentions the earlier withdrawal, explained as "due to conflicting circumstances that prohibited petitioner from gaining [his] freedom."

The Supreme Court of Appeals appointed counsel, who added to the direct petition a plea to reinstate the prior writ of error. Counsel represented that the withdrawal had been occasioned by fear that a possible retrial might result in the death penalty.[1] Counsel, while admitting that the state court's standards governing reactivation of appeals were unclear, argued that the writ of error ought to be reinstated because review had not been intelligently waived under the standards of Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d. 837 (1963).

The State supreme court entered orders separately denying the motion to reinstate the writ of error on April 24, 1968, and dismissing the original habeas corpus petition on March 6, 1968.

Thereafter the federal litigation was initiated in the District Court for the Western District of Virginia. The file has by now become immense, and the following summary of McLaughlin's allegations is drawn from papers filed by him, pro se, and by counsel, over the course of some years.

Briefly, he contends here that his plea of guilty was involuntary because it was entered on the advice of ineffective counsel and at a time when the petitioner was incompetent to stand trial. His plea was also, allegedly, coerced by preju-

dicial publicity and by the known prejudice of the trial judge.[2]

McLaughlin's mental state in 1962 he attributes to a mental illness of long standing, to alcoholism, and to the effect of tranquilizers administered on the day of trial.

His trial counsel failed him, allegedly, in consulting with him only once prior to trial; in attempting to go to trial when the petitioner was unable to cooperate; in advising waivers of preliminary hearing, indictment, and jury trial and entry of a guilty plea; in failing to investigate the facts of the case by such means as interviewing witnesses, in order to find evidence of provocation and mental passion which would reduce the charge to second degree murder; in failing to investigate the petitioner's competency to stand trial; and in failing to investigate the merits of a defense of insanity at the time of the offense.

McLaughlin complains as well of the manner in which he was taken to a state hospital after his arrest and detained for 135 days just prior to trial.

The western district court issued a show cause order and requested the production of pertinent state court records.

Thereafter, McLaughlin amplified his claims of incompetency to be tried. One amendment alleges that when he arrived at the state penitentiary in Richmond, Virginia, the day following the trial, he was found by a prison physician to be in such a mentally deranged state as to require isolation, and that on February 6, 1963, he was returned to Southwestern State Hospital, where he remained a further 120 days. In addition, he alleges that only a few days prior to trial, in November of 1962, one Dr. Smiley was of the opinion that the petitioner was in no state of mind to stand trial.

Furthermore, he states that only hours after the crime a doctor in Galax,

---

1. Pro se, the petitioner filed papers describing his state of acute hypertension and anxiety at the time of his voluntary dismissal.

2. The contentions concerning prejudicial publicity and an impartial tribunal have not been pursued, and the court considers them abandoned at the present stage of this litigation.

Virginia, found him to be in a "mentally and physically deteriorated" state. This possible support for an insanity defense allegedly was overlooked by defense counsel.

Concerning the withdrawal of his appeal in late 1964, McLaughlin alleges that he was physically sick as well as extremely despondent and confused by the advice given him by counsel in the habeas case. A letter from his lawyer is filed, dated December 8, 1964, which confirms, apparently for the second time, that the petitioner might face the death penalty on retrial, and states that "I now believe you when you say that your mental condition is such that you do not know what is going on . . . ."

The western district court dismissed the action, apparently on grounds of deliberate bypass and because it was the conclusion of the doctors at Southwestern State Hospital who examined him prior to trial that McLaughlin was competent. Their report is in the record of the criminal trial.

The dismissal order was appealed. The Court of Appeals remanded the case without deciding the issues to this court with instructions to consider the claims presented in collateral attack in a de novo hearing. Remand was to this court for the reason that other cases concerning the conditions of McLaughlin's confinement were being remanded for hearing as well, and no substantial economy of effort, therefore, would be afforded by a review on the existing record. "Although we express no opinion on the merits," the court stated, "we note that there is some indication in the record of a history of mental illness on both paternal and maternal sides of the defendant's family and that he was discharged from the Army for mental disability."

Pursuant to that mandate, counsel was appointed and one hearing already has been held. This court now concludes that in order to comply completely with the mandate of our Court of Appeals and the terms of the habeas corpus statute further evidence must be taken. A few preliminary issues will be disposed of in this opinion, and the court will attempt to give guidance to counsel as to the direction of further inquiry.

### Exhaustion of state remedies

The petitioner has no further avenues of relief within the state judicial system that he has not already pursued. Not only has Virginia's highest court refused leave to take what is in effect a belated appeal from the adverse holding of the state habeas court, but it also entertained his original petition and denied it without a hearing.

Had the application for a belated appeal alone been ruled on, some doubt might remain whether McLaughlin should not be required again to present his allegations to the lower state court. Conceivably he might thereby gain a ruling on the merits of his claims from the Supreme Court of Appeals. Recent Fourth Circuit rulings make it doubtful, however, that he should even then have to take that route. Wiggins v. Cox, No. 14,727, mem. decis. (4th Cir. Oct. 22, 1970); compare Lindell v. Peyton, No. 12,258, mem. decis. (4th Cir., Sept. 23, 1968).

The question is resolved, however, by the state supreme court's ruling on the direct petition. To satisfy the exhaustion requirement a federal habeas petitioner need only secure a ruling on the merits from the highest state court accessible to him. Cf. Leftwich v. Coiner, 424 F.2d 157 (4th Cir. 1970). Although the Supreme Court of Appeals did not state grounds for denying relief in the direct petition, its ruling signifies either that McLaughlin's claims are without merit or that consideration of them is barred by his failure to pursue the 1964 appeal from the Circuit Court's decision. In either event, exhaustion has been accomplished.

### Deliberate bypass

Although he is not now obliged to present a second time to the State courts those contentions on which he was denied relief in the Supreme Court of Appeals, a question remains whether by with-

drawing his appeal and forfeiting his right to state remedies McLaughlin did not foreclose the possibility of federal relief as well.

At the federal hearing the petitioner testified that he withdrew his petition for a writ of error because he felt too ill to proceed at the time, had lost confidence in his lawyer, and felt that the prospects for success were dim. He also said that he did not understand the consequences of the withdrawal. His counsel had advised him that he might receive the death sentence on retrial, but he did not know whether to accept this advice. The attorney who represented McLaughlin in the 1964 habeas corpus case was not called to testify.

The effect of the petitioner's termination of the State collateral attack has demonstrably been that he "by-passed the orderly procedure of the state courts and in so doing has forfeited his state court remedies," Fay v. Noia, *supra,* at 438, 83 S.Ct. at 849. As a result of this action, if knowingly taken, it is "open to the federal court on habeas to deny him all relief if the State courts refused to entertain his federal claims on the merits—though of course only after the federal court has satisfied itself, by holding a hearing or by some other means, of the facts bearing on the applicant's default." *Id.,* 439, 83 S.Ct. at 849.

■■■ Such a denial of relief to the end of protecting State procedures is, however, discretionary, and this court, in the exercise of its discretion, is governed by federal principles. Before the court may consider imposing a forfeiture, it must first be assured that the rights forfeited were understandingly waived under the standard of Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). Here we have only the petitioner's testimony that he was sick, mistrusted his lawyer's advice, and did not understand the effect of his actions. This is insufficient basis upon which to find "an intentional relinquishment or abandonment of a known right or privilege," *Id.* See Hayden v.

Warden, 363 F.2d 647 (4th Cir. 1966), rev'd on other grounds, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).

The Court is particularly reluctant to find that this layman, who challenges herein his own mental fitness among other things, was cognizant of the effect on subsequent collateral proceedings of a prior unappealed adjudication, an issue which has been a matter of substantial legal debate. See Hawks v. Cox, 211 Va. 91, 175 S.E.2d 271 (1970). The best evidence of McLaughlin's understanding of the import of his acts would be the testimony of the lawyer who advised him. That has not been heard. On the basis of the evidence before the court, the only possible conclusion is that no knowing waiver took place.

The same conclusion is compelled even if one imputes to the petitioner the language used by counsel in the attempt to reinstate the writ of error, which indicates that the appeal was asked to be withdrawn in 1964 on account of fears that its success might lead to the imposition of the death penalty. Under this explanation, the petitioner did not make the sort of deliberate tactical choice which would disqualify him from federal relief. Fay v. Noia, *supra,* 440, 83 S.Ct. 822, 9 L.Ed.2d 837. Whether to impose a forfeiture of federal habeas remedies is governed by this court's equitable discretion. Assuming McLaughlin understood and intended that by withdrawing his appeal he was relinquishing his claims, this court still would permit their prosecution in this action. Cf. Aldridge v. Henry, No. 13,920, mem. decis. (4th Cir. April 24, 1970).

*Findings of the State habeas corpus court*

The Circuit Court of Roanoke County found, concerning the petitioner's claim of incompetency to stand trial, that he was committed for mental examination on motion of the Commonwealth's Attorney to the state hospital in Marion on June 13, 1962, and remained there for 135 days. The report on his condition, dated October 30, 1962, was received in

evidence and relied upon. Its conclusions in full are as follows:

Since admission he has been carefully studied and history obtained so far as practical. Psychologically he tests at the average level of intelligence. He is a person who has been dependent, self-centered, and who has used alcohol excessively and shows definite neurotic features along with depressive symptoms of a reactive nature. Our official diagnosis is "Sociopathic Personality Disturbance, Alcoholism (addiction), (with neurotic features)." In my opinion he has not been psychotic or insane since admission and is competent to return to Court and to stand trial.

The State habeas court also found that McLaughlin was examined at the penitentiary by Dr. Brick on November 18, four days after his trial, was kept in the prison hospital until December 14, and was considered within "normal" limits save for depression when classified on December 15. It was also found that on January 30, 1963, Dr. Brick of the penitentiary considered the petitioner's state to be "psychotic depressive reaction," and that he was again sent to Southwestern State on February 6, 1963, to stay until May 29, 1963.

The State court concluded that McLaughlin had failed to sustain the burden of showing that he was "insane", see Va. Code § 19.1–228 (Supp.1970). Apparently this was because insanity must be demonstrated, the court ruled, by clear and convincing evidence, because the petitioner was bound by the uncontradicted evidence of his own witnesses, Dr. Brick and Dr. Blalock, and because neither doctor testified that the petitioner "was insane within the legal meaning of the term at the time of his trial, nor at any other time."

 Under the rule governing federal habeas corpus proceedings, this Court cannot rely upon the State court's findings as sufficient basis to decide his claim of incompetence to stand trial.

In the first place, no specific finding of fact has been made as to McLaughlin's condition when he was tried, despite that he testified on the point. Without specific factfindings, this Court can resolve factual issues without a hearing only when the State Court's view of the facts is inferrable from the standard of law applied and the disposition made of the case. Townsend v. Sain, 372 U.S. 293, 315–16, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); Heisler v. Cox, 431 F.2d 581 (4th Cir. 1970). Here, that too is impossible because the ruling against the petitioner was apparently based upon a restrictive rule of the relevance of evidence which kept the State court from deciding the central issue of competency.

Although Dr. Brick had seen McLaughlin four days after the trial, he did not see him personally as soon as he arrived in Richmond nor could he testify as to his condition on the day of trial. In January of 1963, this doctor testified, McLaughlin was delusional; he was diagnosed as in a state of psychotic depressive reaction, a condition of insanity under which his decision was impaired. This state was similar to that of November 18, and was of the sort that might recur, the doctor said.

Dr. Blalock testified that his diagnosis, too, implied an impairment of the decisional process.

Nonetheless, the State habeas court ruled that, because neither doctor testified that McLaughlin was insane when tried, he had failed to carry his burden. In apparently considering so narrowly the testimony of these expert witnesses, the State court failed to provide the petitioner with the full and fair hearing which would lend reliability to its findings. See Kibert v. Peyton, 383 F.2d 566 (4th Cir. 1967). On the issue of the competency of the petitioner to stand trial, he has the right to a federal hearing.

Concerning the constitutional adequacy of McLaughlin's legal representation, the Court found only that he chose his own lawyer, that he was unable to compensate the attorney but told him that he wished only to plead guilty and waive jury trial, and that the attorney succeed-

ed in securing the agreement of the prosecutor to recommend a life term in exchange for a guilty plea. These findings, to the extent that they relate to the attorney's competence, are well-founded in the State habeas record, but they do not conclude the issue of effective representation.

### Federal hearings

In federal collateral proceedings the Court has so far had only the benefit of the testimony of the petitioner himself. His recollection of the trial events was vague indeed. According to McLaughlin his lawyer spoke with him only for very short periods on November 12 and 13 and never told him that the charge was first degree murder, nor that a life term was likely. The petitioner said that he was very sick at the time and accepted his lawyer's advice to plead guilty and waive preliminary hearing, grand jury and trial by petit jury because he feared that he would collapse or "crack up" if he had to await the January 15 grand jury. His knowledge of the trial itself, he said, is gleaned primarily from the transcript; prior to the trial he was given some sort of medication, and he sat through the proceedings "in a daze."

The Court is unwilling to resolve the question of the sufficiency of McLaughlin's legal representation and his own competence to be tried on this scant testimony. In accordance with the statutory command to "dispose of the matter as law and justice require," 28 U.S.C. § 2244, the Court shall conduct further hearings on these questions.

McLaughlin's two claims—ineffective counsel and his own incompetency to stand trial—are interlocking and related. For although the right to the assistance of counsel may be waived like most constitutional rights (and such a waiver may be included within the decision to plead guilty), the waiver and the plea itself may be impeached by a showing of the defendant's incompetency. Thomas v. Cunningham, 313 F.2d 934 (4th Cir. 1963). The due process right to face trial only while capable of understanding and assisting in the proceed-

ings is not, however, subject to waiver, Pate v. Robinson, 383 U.S. 375, 384, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966).

A defendant unable to assist in the preparation of his defense cannot equip his lawyer to be effective in his behalf. Moreover, the specific claims of ineffective assistance of counsel in this case include the failure of the petitioner's lawyer adequately to investigate his client's mental state and to insist on a judicial determination of the matter.

Under Pate v. Robinson, *supra,* state hearing procedures must be set in motion whenever it appears in the course of the proceedings that a bona fide doubt as to a defendant's competency exists. The Virginia statute in effect when the petitioner was tried provided for commitment for examination of a defendant:

> If, prior to the time for trial of any person charged with crime, either the court or attorney for the Commonwealth has reason to believe that such person is in such mental condition that his confinement in a hospital for the insane or a colony for the feeble-minded is necessary for proper care and observation, the court or the judge thereof may, after hearing evidence on the subject, commit such person . . . pending the determination of his mental condition. Va.Code § 19.1–228 (1960 Repl. vol.)

Alternatively the same section provides for the appointment by the court of one to three physicians, specialists in the field, to examine the defendant prior to commitment.

In addition, the law provided for a determination of the defendant's "sanity" by special trial:

> If a court in which a person is held for trial see reasonable ground to doubt his sanity or mentality at the time at which, but for such a doubt, he would be tried, it shall suspend the trial and it may then proceed as prescribed in the foregoing section or it may impanel a jury at its bar to inquire into the fact as to the sanity or mentality of such person. Va.Code § 19.1–229 (1960 Repl. vol.).

Although the latter section provides that a courtroom determination is optional, *Pate* requires that "state procedures must be adequate to protect this right," Pate v. Robinson, *supra*, 378, 86 S.Ct. at 838 not to be tried while incompetent. When an adequate showing has been made to raise the issue, the trial court should order a hearing sua sponte, Clonch v. Boles, 419 F.2d 393 (4th Cir. 1969), and the issue cannot be decided solely on the basis of reports of medical conclusions. Pate v. Robinson, *supra,* 386, 86 S.Ct. 836, 15 L.Ed.2d 815; Brizendine v. Swenson, 302 F.Supp. 1011, 1018 (W.D.Mo. 1969).

The record in this case is silent at present as to the sort of evidence which prompted the county court to commit the petitioner shortly after his arrest. Although the pre-commitment hearing contemplated by § 19.1–228 does not decide the issue of competency, but rather the existence of "reason to believe" that the defendant may be incompetent, the evidence which was there presented would bear upon the court's duty sua sponte to conduct a hearing on competency. Compare Wilson v. Bailey, 375 F.2d 663 (4th Cir. 1967); Hawks v. Peyton, 370 F.2d 123 (4th Cir. 1966). Although the report of Dr. Blalock concludes that the petitioner was "not psychotic or insane" and "competent . . . to stand trial," it found too that he showed "definite neurotic features along with depressive symptoms of a reactive nature." Whether this report was sufficient in itself to raise a bona fide doubt and call therefore for a hearing, or whether in its finding of competence it was sufficient to dispel any doubts earlier entertained, this Court shall not determine until the evidence is more fully presented.

Whether the rule of *Pate* applies to trials, such as the petitioner's, which took place before that decision, is an open question in this circuit. Indications are strong, however, that the case does apply retroactively, Westbrook v. Arizona, 384 U.S. 150, 86 S.Ct. 1320, 16 L.Ed.2d 429 (1966); Wilson v. Bailey, *supra*, 668. The purpose of the new ruling, requiring that the question of competency be decided by a process of "concurrent determination" whenever it is fairly raised, is to guarantee the only fully reliable resolution of an issue that goes to the core of a fair trial. Practical considerations—the relative infrequency of the new decision's application—favor retroactive effect. Moreover, the extent of justifiable reliance on contrary doctrine in this area seems small. Cf. Thomas v. Cunningham, *supra.* Final decision of the retroactivity issue will, however, be deferred until it is plain that the facts of the case require a ruling and until counsel have the opportunity to argue the point.

▇▇ Separate from the *Pate* issue of failure to conduct a competency hearing is the question whether the petitioner in fact was competent. Although indications of incompetence may have been insufficient to require suspension of his trial, still McLaughlin may contest whether his plea was entered when he had in fact "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding —and whether he [had] a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960).

The allegation that the petitioner was an alcoholic, was discharged from military service for mental problems, was drugged during the trial, and spent extended periods in a mental hospital both before and after the proceedings, together with the testimony in the State habeas transcript indicating at the least the onset of a recurrent psychotic condition shortly after trial, are more than sufficient to require a full hearing and factfindings as to competency. Hilliard v. United States, No. 13,345, mem. decis. (4th Cir., Aug. 25, 1969).

The substantial doubt as to the petitioner's mental state when tried called into question his counsel's performance too. Caudill v. Peyton, 368 F.2d 563 (4th Cir. 1966), is a similar case. Despite the doubt evidenced by the

State's original decision to commit for observation and the equivocal and cursory nature of the report returned, no apparent inquiry was made as to the merits of an insanity defense or the defendant's present competency. The report would not conclude the issue of competency, Caudill v. Peyton, *supra*, 565. Counsel has a duty to "explore the matter further and adduce evidence in court, when there was reason for doubt as to the mental condition of the accused . . . ." Kibert v. Peyton, *supra*, 383 F.2d 569. McLaughlin need not show that he was in fact incompetent in order to succeed on this theory. He need only show that counsel's failure to pursue what should have been reasonable doubts as to his competency was prejudicial to him. Owsley v. Peyton, 368 F.2d 1002, 1003 (4th Cir. 1966). See also, Brizendine v. Swenson, *supra*, 302 F. Supp. 1020–21. This Court has no evidence or reliable factfindings concerning the lawyer's conduct. It may be that he made investigations and resolved his doubts. Compare Stokes v. Peyton, 437 F.2d 131 (4th Cir., 1970). This is a matter for further inquiry.

So, too, are the questions of counsel's failure to inquire into the merits of a possible insanity defense and advise his client on the likelihood of success, and the possibility of a denial of counsel at the time when this defense could best be prepared. Timmons v. Peyton, 360 F.2d 327 (4th Cir. 1966).

The allegations that counsel conferred only briefly with the petitioner on the day of trial, that he failed to turn up facts which might have reduced the charge, and that he advised waivers of procedures which might have been useful for discovery purposes are also subjects for further hearings. The Court notes, however, that unless these contentions are coupled with a showing of possible prejudice, a case of ineffective representation is not made out.

McLaughlin's plea of guilty may have constituted a valid waiver of these claims of ineffective counsel, assuming he was competent to make such a decision. But the cases holding a guilty plea to foreclose collateral attack based on prior constitutional violations, even when the plea is in part motivated by fear of the death penalty or by prior constitutional violations, are predicated upon the assumption of adequate legal advice. McMann v. Richardson, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); Parker v. North Carolina, 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785 (1970). The right to counsel's aid, too, may be waived, but such a waiver must be knowing and voluntary under Johnson v. Zerbst, *supra*.

### Civil Rights Act claims

The greater part of the federal hearings to date have concerned the conditions of the petitioner's confinement.

McLaughlin has been confined in the Virginia State Farm since September, 1964, with the exception of a brief hospital stay. He contends herein that the labor he has been forced to perform, given his medical problems, constituted cruel and unusual punishment, that his ailments have not been adequately treated, that the living conditions in his cell are intolerable, that he has been the subject of summary corporal punishment, and that his mail has been delayed and interfered with by officials. He also claims that he is inadequately protected from assaults by other prisoners and from exposure to homosexual activities. Damages as well as an injunction are sought.

The petitioner has not been subject to work assignment since June, 1968. He is confined in the C–5 high-security section, having been placed there at his own request in order to avoid more dangerous inmates among the general population. At his request he is also generally kept on "lockup," which means that he is confined to his cell, but McLaughlin still feels personally insecure.

The Assistant Superintendent testified, and the Court finds, that the petitioner is never transferred by prison officials from one to another work assignment without consulting him. He was

transferred to an outdoor job at one point with his concurrence, and subsequently he was moved back indoors at his request.

Earlier during his detention at the farm McLaughlin was compelled to work in the laundry, which job involved exposure to heat and the handling of materials from the prison hospital which might contain blood, flesh, or surgical tools. He was not forced to lift heavy objects, and no injuries were reported by men doing these tasks. Although the evidence was unclear on how long it took McLaughlin to effect a transfer from this work, he did testify that when he brought his condition—he suffers from residual effects of polio and has a weakened spine—to the attention of prison officials, including a doctor, he was transferred to less strenuous work. Conditions of another job in the prison tailor shop are not complained of.

 Prisoners validly convicted may be forced to perform work, whether or not compensated and whether or not related to purposes of rehabilitation, so long as it does not amount to cruel and unusual punishment. Holt v. Sarver, 309 F.Supp. 362 (E.D.Ark.1970). The conditions described by McLaughlin do not violate the minimum standards of human decency embodied in the Eighth Amendment. Compare Wright v. McMann, 387 F.2d 519, 526 (2d Cir. 1967). Grounds for injunctive relief at any rate do not appear, for the reason that McLaughlin now asserts that he is not subject to any work requirement. Nor, for the reasons stated, has a case for a damage award been made. No medical testimony was adduced to support the claim that a particular disability made the petitioner's labor cruel as to him; much less is there evidence that, having become aware of the petitioner's condition, the officials inflicted a form of punishment by keeping him at jobs which they knew would injure his health.

The evidence of denial of medical care is also insufficient to warrant relief. The petitioner testified that he currently receives medication for nervousness and a special diet for ulcers from which he suffers. He made numerous references to medical examination by prison doctors. One prison guard delivers McLaughlin certain medicine prescribed for him, and a prison nurse does the same once each day. The latter testified, and the Court finds, that he never denied the petitioner his medicine and that the petitioner never complained to him of any such denials. No evidence has been presented of a current medical problem that has not received attention. Relief on these claims shall be denied. Jacobs v. North Carolina State Department of Correction, No. 13,332, mem. decis. (4th Cir. Nov. 20, 1969); Davis v. Brown, No. 13,274, mem. decis. (4th Cir. July 1, 1969); Hirons v. Directors, 351 F.2d 613 (4th Cir. 1965).

 The petitioner's cell has on occasion been occupied by mice and roaches, and the windows in the building have been broken at times. McLaughlin's testimony on this point is supported by other inmates and officials. The Assistant Superintendent, who has charge of the physical facilities, testified, and the Court finds, that periodic antirodent and antiroach treatments are used and that windows are replaced on a daily basis. McLaughlin himself testified, and the Court finds, that he was given a mousetrap for his own use, that an exterminator has worked on his cell, and that windows have recently been replaced. Although the presence of vermin in a cell can be grounds for judicial intervention, Robinson v. Cunningham, No. 13,885, mem. decis. (4th Cir. Nov. 20, 1969), and unconstitutional conditions are not excused by the expense necessary to effect a remedy, Holt v. Sarver, *supra,* equity does not require injunctive relief from these conditions. The best of homes may have some roaches. Here reasonable efforts are regularly made to preserve decent sanitation, and no evidence has emerged that any prisoner has become ill by reason of the conditions. The Constitution only requires that individuals not be exposed to conditions so dangerous and uninhabitable as to be

**312**

shocking; the evidence here does not indicate that the efforts of officials to prevent such conditions have been unavailing.

■ In 1962, while McLaughlin was at the penitentiary, a guard named Sidney Taylor struck him with a tear gas gun in an apparently unprovoked attack. This is the sole instance of physical abuse of McLaughlin by a guard. Because such incidents are so rare, injunctive relief is not warranted. Damages, too, are not recoverable, assuming that any present party might be liable therefor, by reason of the two-year statute of limitations fixed by State law, Va.Code § 8–24 (1957 Repl. vol.), and applied in actions under Section 1983.

■ The petitioner's access by mail to courts is at present unhampered. This is demonstrated not only by his constant flow of communications to this and other courts, but also by his own testimony and that of the Superintendent, Oliver. While confined at Central State Hospital, his mail was interrupted, but there is no evidence of a present likelihood of his being moved to that facility, nor were any damages flowing from mail delays shown. Consequently, an injunction guarantying access to courts and counsel shall not issue.

■ The petitioner sincerely fears for his own security at the state farm, particularly as it may be threatened by other inmates intending injury or homosexual attacks. Prison officials do have a duty to protect inmates from continued exposure to the likelihood of attacks from fellow inmates; the reckless endangering of prisoners may amount to cruel and unusual punishment, Holt v. Sarver, *supra*, and the injuries inflicted may constitute punishment without due process, Robert v. Williams, 302 F.Supp. 972 (N.D.Miss.1969), Cf. Jenkins v. Averett, 424 F.2d 1228 (4th Cir. 1970). In this case, however, the petitioner does not allege any injuries. Nor do the circumstances of his detention approach the barracks life depicted in *Holt*.

At one time McLaughlin was threatened by a homosexual wielding a knife.

According to him, he requested assignment to C–5 in order to avoid such assaults. Now he leaves that block only in company of a guard, and at least two guards are on duty there at all times.

According to the petitioner, guards in C–5 allow overt expressions of homosexual feelings, short of the act itself, to go on without interference. Passing the question whether, if true, this would entitle McLaughlin to relief, the court finds that his accounts of such incidents are much exaggerated. The inmate Breeden and the guard Lambert both testified that no significant activity of the sort goes on in C–5.

Only one concealed weapon has been found in C–5. McLaughlin is rarely attacked or threatened by other inmates, and the Assistant Superintendent testified, and the Court finds, that there are few specific indications of hostility to the petitioner on the part of other prisoners.

■ In a penal institution there is always the danger of riots, or lesser disturbances, which may result in injuries to nonparticipants. This exists, probably, so long as each inmate is not confined behind bars at all hours. It is not, however, cruel and unusual to expose inmates to the fairly remote risk of such isolated and brief occurrences, so long as reasonable precautions are taken to provide personal security from substantial continuing threats. The evidence in this case shows that the Constitution has been complied with in this respect.

In accordance with this memorandum, an order shall enter this day denying relief on the claims presented under the Civil Rights Act and calling for further hearings in the habeas corpus case.

## ORDER

For the reasons stated in the memorandum of the Court this day filed, and deeming it proper so to do, it is adjudged and ordered that:

1. R. M. Oliver, Superintendent of the Virginia State Farm, is substituted as party respondent herein. Said respondent shall release the petitioner from fur-

ther custody pursuant to his conviction in the Circuit Court of Roanoke County, Virginia entered on November 14, 1962, resulting in the sentence of confinement for life.

2. The effect of this order is stayed sixty days to permit the Commonwealth of Virginia to re-try the petitioner if it be so advised.

3. The Clerk is directed to return the State records after 30 days if no appeal is noted. If appeal is noted, the Clerk is directed to retain the records pending final disposition of the case.

4. Let the record reflect the Court's appreciation to court-appointed counsel for the petitioner, Francis M. Fenderson, Jr., and to Van Lefcoe, Assistant Attorney General of Virginia, for the assistance rendered to the Court by each of them in the presentation of this matter.