(No. 74935.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. LESLIE PALMER, Appellant.

*Opinion filed October 20, 1994.—Rehearing denied December 5, 1994.*

468

HARRISON, J., joined by McMORROW, J., dissenting.

Charles M. Schiedel, Deputy Defender, and Jon E. McPhee, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Roland W. Burris, Attorney General, of Springfield, and Alan D. Tucker, State's Attorney, of Havana (Rosalyn B. Kaplan, Solicitor General, and Terence M. Madsen and Martha E. Gillis, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

Defendant, Leslie Palmer, pleaded guilty in the circuit court of Mason County to three counts of first degree murder (Ill. Rev. Stat. 1991, ch. 38, pars. 9—1(a)(1), (a)(3)), and one count each of home invasion, residential burglary and armed robbery (Ill. Rev. Stat. 1991, ch. 38, pars. 12—11, 19—3, 18—2(a)). He was convicted of felony murder, home invasion and residential burglary. Defendant was sentenced to determinate terms of imprisonment on the residential burglary and

home invasion convictions. On the felony murder conviction, defendant was sentenced to death.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 21, 1992, the victim, 85-year-old Gertrude Nussel, was found dead on the floor in her Havana, Illinois, home. Fingerprint evidence taken from the crime scene revealed that defendant had been present in the victim's home. Defendant was subsequently picked up by police for questioning. After being given *Miranda* warnings, defendant made an oral statement admitting his involvement in the commission of the offense.

In his statement, defendant told police that he and Scott Kinkead had decided to "hit somebody off." (Defendant defined the phrase as meaning to rob someone.) The two, along with Kinkead's girlfriend, Tara Poppenhager, drove around for a while, eventually coming to the home of Gertrude Nussel. Defendant and Kinkead gained entry to Nussel's home on the pretext of needing to use the telephone. Poppenhager, having been instructed by either Kinkead or defendant to drive around for a while, did not accompany the two inside the home.

Once inside, defendant asked Nussel the whereabouts of her purse. When Nussel replied that her sister had it, defendant put her in a "sleeper hold" (putting one arm behind the victim's neck and one arm around the throat to cut off the air supply) intending to render her unconscious. As defendant was holding her, Nussel showed him the location of the purse. Defendant then followed her to that location and tried to "put her to sleep again."

Nussel gave defendant and Kinkead the purse and defendant "put her in sleeper again, tried to put her out so we could leave." She would not "go to sleep" so defendant put his knee on one hand, held her other hand and tilted her head back. As defendant was holding Nussel

down, Kinkead slashed her throat. Defendant and Kinkead then went into the bedroom of the home where they found three $20 bills in a small box.

They left the home, with defendant carrying the victim's purse and the three twenties. Once reunited with Poppenhager in the car, Kinkead went through the purse and found a $5 bill and some ones. Defendant divided the three twenties and Kinkead divided the money from the purse equally between the three of them.

Defendant was indicted for three counts of first degree murder and one count each of home invasion, residential burglary, and armed robbery. At his March 1992 arraignment, defendant entered a plea of not guilty to all six counts.

Subsequently, on July 2, 1992, at a pretrial conference, defendant indicated to the court his desire to withdraw his prior plea of not guilty and to enter a plea of guilty on all of the charges. At that time, the State indicated to both defendant and the court that there had been no negotiations and no agreement in exchange for defendant's plea. Further, the State asserted a reservation of its right to seek the death penalty upon defendant's plea or his conviction. The court continued the matter for the express purpose of permitting defendant additional time to consider his decision to plead guilty.

As the validity of defendant's plea is at issue in this case, we set out the particulars of the plea proceeding at length.

Court was reconvened on July 7, 1992. At that time defense counsel informed the court of defendant's continued desire to enter a plea of guilty and further that the plea was not negotiated. The court then advised defendant of the irrevocable nature of entering a guilty plea and admonished him that the State was still

seeking the death penalty. Defendant stated that he understood.

The court then read each of the six counts of the indictment and the potential penalties for conviction on each; again admonished defendant that the State was continuing to seek the death penalty; advised defendant that the effect of his plea was waiver of various constitutional rights; and informed defendant of his entitlement to certain rights with respect to the death sentencing procedures. In response to the court's inquiry, defendant stated that he understood.

In response to the court's inquiry as to whether defendant had any questions concerning the charges, potential penalties or his rights, defendant replied in the negative. Defendant persisted in his desire to withdraw his previous plea and to enter a plea of guilty. To insure defendant's understanding, the court repeated the six charges in the indictment. Defendant pleaded guilty to all of the charges.

After entering his plea, defendant acknowledged for the court that his plea had not been induced by threats or promises and further that no one had promised or insinuated that he would not receive the death penalty or a lenient sentence in exchange for the plea. Defendant also stated that he was satisfied with his representation, that the pleas were being made after consulting with both his attorney and his family, and that he was pleading guilty because he was, in fact, guilty of the offenses as charged.

The State then presented the factual basis for the plea, which consisted largely of defendant's prior inculpatory statement to the police. Defendant acknowledged that he had given the statement voluntarily. The court found a sufficient factual basis to accept the plea.

The court next directed its inquiries to defense counsel. Counsel acknowledged that he had received the

State's evidence and had discussed it with defendant. Counsel also acknowledged that he had reviewed defendant's inculpatory statement and that he had discussed the statement with defendant. He further stated his belief that if this matter were to proceed to trial the State could properly introduce the evidence it had presented in support of defendant's plea.

The court then entered judgment against defendant on all six counts of the indictment.

Prior to sentencing, defendant moved the court to withdraw his guilty plea, asserting that the plea was the result of a misunderstanding between him and trial counsel. After hearing on the motion, the court determined that defendant's plea had been entered knowingly and voluntarily. Defendant's motion to withdraw his plea was, therefore, denied and the case proceeded to sentencing.

Defendant waived a jury for sentencing. At the eligibility stage of sentencing the court found the presence of a statutory aggravating factor beyond a reasonable doubt. (See Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(6)(a)(ii).) Following a hearing on aggravation and mitigation, the court pronounced its sentence. On the charge of first degree murder committed during the commission of a forcible felony (armed robbery), defendant was sentenced to death. Defendant was additionally sentenced to 15 years for residential burglary and 30 years for home invasion, the sentences to run concurrently.

Subsequent to sentencing, defendant filed a post-trial motion seeking vacatur of his guilty plea and death sentence. In support, defendant claimed, *inter alia*, ineffective assistance for counsel's failure to obtain concessions in exchange for his guilty plea. Defendant urged that he had been prejudiced because Kinkead, who "was clearly *** more culpable," had been offered a

determinate sentence in exchange for his plea. Defendant's motion was denied. Incidentally, although Kinkead was offered a plea agreement, he rejected the State's offer and, like defendant, was ultimately sentenced to death.

Defendant appealed directly to this court. (Ill. Const. 1970, art. VI, § 4(b); Ill. Rev. Stat. 1991, ch. 38, par. 9—1(i); 134 Ill. 2d R. 603.) Sentence has been stayed pending our review. (134 Ill. 2d Rules 603, 609(a).) We now affirm.

## GUILT PHASE

Defendant's first contention on appeal is that his guilty plea was not voluntary and knowing where it was entered as the result of ineffective assistance of counsel. Defendant maintains that trial counsel was deficient in advising him to enter a "blind plea" (guilty plea without a plea agreement) without counsel ever having sought from the State a fixed term of imprisonment in exchange for the plea.

Defendant's claims of an involuntary plea and ineffective assistance are, under these facts, interlocking. Resolution of the question of whether a defendant's pleas, made in reliance on counsel's advice, were voluntary and knowing depends on whether the defendant had effective assistance of counsel. If the pleas were made in reasonable reliance upon the advice or representation of his attorney, which advice or representation demonstrated incompetence, then it can be said that the defendant's pleas were not voluntary. *People v. Correa* (1985), 108 Ill. 2d 541, 548-49; see also *McMann v. Richardson* (1970), 397 U.S. 759, 770-71, 25 L. Ed. 2d 763, 773, 90 S. Ct. 1441, 1448-49.

Of course, a defendant may enter a plea of guilty because of some erroneous advice by his counsel; however, this fact alone does not defeat the voluntary nature of the plea. (*Correa*, 108 Ill. 2d at 548-49.)

Whether a plea of guilty is unintelligent and vulnerable depends not on whether a court would retrospectively consider counsel's advice to be right or wrong, but whether that advice was within the range of competence demanded of attorneys in criminal cases. (*Correa*, 108 Ill. 2d at 553, citing *McMann*, 397 U.S. at 770-71, 25 L. Ed. 2d at 773, 90 S. Ct. at 1448-49.) A plea based on reasonably competent advice is an intelligent plea not open to attack on the grounds that counsel erred in his judgment. *McMann*, 397 U.S. at 770, 25 L. Ed. 2d at 773, 90 S. Ct. at 1448.

In this case, counsel advised defendant to enter a plea of guilty to the charges pending against him. Part and parcel of that advice was counsel's decision not to pursue plea negotiations. This decision, as opposed to counsel's advice *per se*, now forms the basis of defendant's ineffectiveness claim. Therefore, proper resolution of defendant's ineffectiveness claim requires consideration of a defense attorney's duty to engage in plea negotiations. First, we set out those well-established principles which guide us in our consideration of an ineffective assistance of counsel claim.

Ineffective Assistance of Counsel

To prevail on a claim of ineffective assistance of counsel a defendant must show that counsel's representation fell below an objective standard of reasonableness, as measured by reference to prevailing professional norms, and that the substandard representation so prejudiced the defendant as to deny him a fair trial. (*Strickland v. Washington* (1984), 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 693-94, 104 S. Ct. 2052, 2064-65; *People v. Albanese* (1984), 104 Ill. 2d 504 (adopting *Strickland*); *People v. Franklin* (1990), 135 Ill. 2d 78, 116-17.) A defendant's failure to make the requisite showing of either deficient performance or sufficient prejudice defeats an ineffectiveness claim. (*Strickland*, 466 U.S. at 687, 80

L. Ed. 2d at 693, 104 S. Ct. at 2064.) We find it apt to point out that effective assistance of counsel refers to competent, not perfect, representation. (*People v. Odle* (1992), 151 Ill. 2d 168, 173; *People v. Stewart* (1984), 104 Ill. 2d 463, 491-92.) In that vein, we note the strong presumption that counsel's performance fell within a wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 690, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066; *Odle*, 151 Ill. 2d at 173.

Significantly, " '[m]istakes in trial strategy or tactics or in judgment do not of themselves render the representation incompetent.' " (*People v. Hillenbrand* (1988), 121 Ill. 2d 537, 548, quoting *Stewart*, 104 Ill. 2d at 492; see also *Franklin*, 135 Ill. 2d at 118.) In fact, counsel's strategic choices are virtually unchallengeable. (See *People v. Jimerson* (1989), 127 Ill. 2d 12, 33.) Further, the fact that another attorney might have pursued a different strategy is not a factor in the competency determination. See *Hillenbrand*, 121 Ill. 2d at 548-49.

Finally, although *Strickland* dealt with a claim of ineffective assistance of counsel in the context of a capital sentencing proceeding, the test is applicable to challenges to guilty pleas alleging the ineffective assistance of counsel. See *People v. Huante* (1991), 143 Ill. 2d 61; *Hill v. Lockhart* (1985), 474 U.S. 52, 57, 88 L. Ed. 2d 203, 209, 106 S. Ct. 366, 369-70; see also *Correa*, 108 Ill. 2d 541.

Defense Counsel's Duty to Plea Bargain

At oral argument defense counsel stated that he was not seeking a *per se* rule with respect to defense counsel's duty to enter into plea negotiations. However, he maintains that in light of the offer made to codefendant Kinkead, there was a reasonable possibility that a like offer would have been extended to defendant.

We note at the outset that a defendant has no constitutional right to be offered the opportunity to plea

bargain. (See *People v. Ruiz* (1979), 78 Ill. App. 3d 326, 332; *People v. Hampton* (1973), 14 Ill. App. 3d 427, 432.) That notwithstanding, the concept of plea bargaining and its attendant benefits for both parties has been recognized as a necessary element of criminal justice administration. (See *Blackledge v. Allison* (1977), 431 U.S. 63, 71, 52 L. Ed. 2d 136, 145, 97 S. Ct. 1621, 1627; *People v. Davis* (1981), 94 Ill. App. 3d 809, 811; see also 5 L. Pieczynski, Illinois Practice § 11.1 (1989).) In that regard, the American Bar Association Standards for Criminal Justice express that because disposition by plea is mutually advantageous to the defendant and to the prosecution, in many cases, plea discussions are a significant part of the duty of defense counsel. (1 ABA Standards for Criminal Justice § 4—6.1 (2d ed. 1980).) The Standards suggest that plea discussions should be considered the norm and failure to seek such discussion an exception *unless defense counsel concludes that sound reasons exist for not doing so*. The Standards acknowledge, however, that "[i]n some cases the factual or legal situation or considerations of strategy may dictate that no overtures to the prosecution be made." 1 ABA Standards for Criminal Justice § 4—6.1 (2d ed. 1980).

In *People v. Brown* (1986), 177 Cal. App. 3d 537, 549, 223 Cal. Rptr. 66, 74, a case upon which defendant relies, the court recognized that the nature and extent of the duty to bargain imposed on counsel will vary with the facts and circumstances of each case. At a minimum, the court concluded, the duty includes the obligation to initiate plea negotiations where the facts and circumstances of the offense and its proof, as well as an assessment of available factual and legal defenses, would lead a reasonably competent counsel to believe that there is a reasonable possibility of a result favorable to the accused through the process of plea negotiations.

We accept the Standards as instructive: "[p]revailing

norms of practice as reflected in American Bar Association standards *** are [only] guides to determining what is reasonable ***." (Emphasis added.) (*Strickland,* 466 U.S. at 688, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.) Certainly, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland,* 466 U.S. at 688-89, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.

Although strong in their advocation, neither the ABA Standards nor *Brown* suggests that counsel has an absolute duty to engage in plea negotiations. Clearly implicit in these separate authorities, however, is that the failure to pursue plea negotiations may, in certain cases, properly support a claim of ineffective assistance of counsel. (Accord Annot., 8 A.L.R.4th 660 (1981).) Equally as clear from the Standards is that the decision to pursue plea negotiations may be a matter of trial strategy.

Consistent with the view expressed in the Standards, we conclude that the extent of an attorney's duty to engage in plea negotiations is necessarily defined by the particular facts and circumstances of each individual case. However, an attorney's decision on whether to initiate or pursue plea negotiations may legitimately fall within the realm of trial strategy or professional judgment. With the duty thus defined, we next consider whether defense counsel's failure to enter into negotiations in this case rendered his assistance ineffective.

Defendant's trial attorney testified at the hearing on defendant's motion to withdraw his guilty plea. At that

time, he was examined concerning his advice to defendant to plead guilty and his rationale for not pursuing plea negotiations. Trial counsel testified that he felt that an "open plea" would be in his defendant's best interest. It was his belief that if defendant cooperated and pleaded guilty and asked for the court's mercy, defendant would be sentenced to between 20 and 30 years' imprisonment. Counsel stated that he felt this was a reasonable expectation.

In that regard counsel testified, "I felt that I could save his life to avoid the death penalty and get a penitentiary sentence. That was my judgment. *** [It] was my strategy to have [defendant] plead guilty and based on the fact that he was young, could be rehabilitated and based upon my examination of the evidence he did not actually kill Mrs. Nussel, excuse me, that if he would plead guilty and cooperate with the State and I had no understanding with the State as to what he would do that, it would be better for him at [the] sentencing hearing." Further, counsel stated that defendant understood that it was an "open plea" and that there had been no guarantees.

We perceive trial counsel's failure to pursue plea negotiations to have been a matter of his professional judgment or strategy. Although wrong in his assessment, counsel apparently believed that defendant's entry of a guilty plea would yield the hoped-for concessions from the State at sentencing. Even though his strategy for avoiding the death penalty was unsuccessful, his decision to pursue that particular strategy cannot be deemed incompetent. (Cf. People v. Jones (1991), 144 Ill. 2d 242 (counsel's decision to enter guilty plea as strategy to avoid death penalty, though thwarted, could not support claim of ineffective assistance of counsel).) Errors in judgment or trial strategy do not establish incompetence (People v. Eddmonds (1984), 101 Ill. 2d 44, 70),

"even if clearly wrong in retrospect" (*United States v. Yancey* (7th Cir. 1987), 827 F.2d 83, 90). Moreover, trial performance is not to be judged by a hindsight perspective. (*Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.) Counsel's decision to forgo plea negotiations, as a matter of trial strategy, is not vulnerable to attack as incompetent.

As an aside, we note that in *People v. Barrow* (1989), 133 Ill. 2d 226, 248, this court, specifically citing *People v. Madej* (1985), 106 Ill. 2d 201, 214, and *People v. Haywood* (1980), 82 Ill. 2d 540, 543-44, stated that "an ineffective assistance of counsel claim which arises from a matter of trial strategy will not support a claim of ineffective representation *unless that strategy is unsound.*" (Emphasis added.) However, neither *Madej* nor *Haywood* appears to provide for an exception to the general invulnerability of trial strategy. The citation is incorrect and the proposition too broadly stated.

A narrow exception to the general rule concerning trial strategy is, however, provided in this court's holding in *People v. Hattery* (1985), 109 Ill. 2d 449, 464-65. In *Hattery*, as a matter of trial strategy, defense counsel conceded his client's guilt. This court held that counsel could not make such concessions in the hope of obtaining a more lenient sentence where a plea of not guilty has previously been entered, unless the record adequately shows that the defendant knowingly and intelligently consented to his counsel's strategy. (See also *People v. Holman* (1989), 132 Ill. 2d 128 (expressly recognizing the need to construe *Hattery* narrowly).) As we are not here confronted with facts analogous to those in *Hattery*, we need not further digress.

Having decided that counsel's decision concerning plea negotiations was a matter of trial strategy, we might well end our consideration of defendant's ineffectiveness claim here. As is apparent, however, defendant

views counsel's decision as other than strategy. Even accepting his view, defendant could yet not prevail on his ineffectiveness claim.

Briefly, as we have stated, a defendant's burden under *Strickland* is to satisfy both prongs of the test: reasonableness and prejudice. Proof of prejudice, however, cannot be based on mere conjecture or speculation as to outcome. (*People v. Hills* (1980), 78 Ill. 2d 500, 505-06.) Defendant's ineffectiveness claim fails for just this reason—it is merely speculative.

Defendant asserts prejudice in that Kinkead was offered the "opportunity to live in exchange for his plea, and it is clear from the record that there was no rational reason that this same offer would not have been extended to [defendant] had counsel simply asked for it." Plea agreements often turn on a variety of factors. (See 5 L. Pieczynski, Illinois Practice § 11.12 (1989).) In every case, each defendant will have his own set of peculiar circumstances which may influence the prosecution's approach to trial and punishment. (See 5 L. Pieczynski, Illinois Practice § 11.25 (1989).) Thus, the mere fact that Kinkead was offered concessions serves as no indication that defendant would likewise have been extended a plea agreement. Defendant's claim is simply too speculative to satisfy the prejudice prong of *Strickland*. See *Odle*, 151 Ill. 2d at 174 (defendant's claim of ineffective assistance for counsel's failure to seek plea agreement rejected where given defendant's overwhelming guilt there was no reason to believe agreement could have been reached with the prosecution); see also *State v. Jackson* (1991), 170 Ariz. 89, 821 P.2d 1374 (court rejected defendant's claim of ineffective assistance where record did not indicate that State ever offered a plea agreement and, further, defendant's allegations that he could have obtained a favorable deal if counsel had pursued a plea agreement were speculative).

Defendant cites to several cases purportedly holding that trial counsel's failure to initiate plea bargaining constitutes ineffective assistance and results in the invalidity of the guilty plea. We have examined these cases. Preliminarily we note that as trial counsel's decisions in those cases were not considered trial strategy those cases are inapposite. Furthermore, in each case, the invalid pleas were not merely the result of a failure to plea bargain, but rather resulted from the cumulative effects of counsel's fundamental errors. In contrast, here it is singularly the absence of plea negotiations which forms the basis of defendant's claim that his guilty pleas are invalid. See *Hawkman v. Parrat* (8th Cir. 1981), 661 F.2d 1161; *Mason v. Balcom* (5th Cir. 1976), 531 F.2d 717; *Walker v. Caldwell* (5th Cir. 1973), 476 F.2d 213; *McLaughlin v. Royster* (E.D. Va. 1972), 346 F. Supp. 297; *Cole v. Slayton* (W.D. Va. 1974), 378 F. Supp. 364.

Defendant cites one other case, *People v. Brown* (1986), 177 Cal. App. 3d 537, 223 Cal. Rptr. 66, which is inapposite, but for a different reason. *Brown* involved a situation where defense counsel *initiated* plea negotiations, but failed to pursue them to conclusion.

We conclude that defendant was not denied effective assistance of counsel where it was counsel's strategy not to pursue plea negotiations and to have defendant throw himself on the mercy of the court. The fact that the strategy was unsuccessful can provide no basis upon which to conclude counsel's incompetency. Defendant raises no additional challenges to the validity of his guilty plea and we find no infirmity. Prior to leaving this issue, however, we note the trial court's exacting compliance with our Rule 402 requirements during the course of defendant's plea proceedings. See 134 Ill. 2d R. 402 (required admonitions to defendants in guilty plea proceedings); see also *Boykin v. Alabama* (1969), 395 U.S. 238, 23 L. Ed. 2d 274, 89 S. Ct. 1709; *People v. McCoy* (1979), 74 Ill. 2d 398, 402.

## SENTENCING PHASE

Relative Culpability

With respect to sentencing, defendant first assigns error to the trial court's alleged consideration of the relative culpability of defendant and Kinkead in its sentencing determination. He argues that because his mental state for felony murder differed from Kinkead's mental state for "an intentional killing," his and Kinkead's levels of culpability also differed. Defendant maintains that a trial judge who viewed the culpability of a person who is guilty of a knowing felony murder on principles of accountability as equal to that of a person who intentionally killed the victim could not have properly weighed the aggravating and mitigating evidence. Defendant contends that he was denied a fair sentencing hearing because the trial court found him and his codefendant equally culpable for the charged offense.

Defendant offers little upon which to base a conclusion of improper sentencing considerations. To support his claim, defendant offers comments made by the trial court at hearing on defendant's post-trial motion concerning both defendants' culpability. True, in responding to defendant's motion, the trial court stated, "As far as the culpability, based upon the evidence which I heard, quite frankly I could not find Mr. Palmer any less culpable than Mr. Kinkead, in view of the evidence and nature of the injuries which were described to the Court in that evidence." The court's comments appropriately respond to the arguments raised in the motion and at hearing and appear to reference each defendant's degree of participation in commission of the offenses. That the court made such a determination, however, does not demonstrate any improper weighing of mitigation and aggravation.

However, as defendant correctly asserts, the sentenc-

ing authority must "carefully weigh the factors, aggravating and mitigating, in order to reach a fair and just result, one that is based on the particular circumstances of the offense and the defendant." (See *People v. Brownell* (1980), 79 Ill. 2d 508, 538.) The degree of each defendant's activity or participation in a crime, however, should also receive attention in passing sentence. (See *People v. Morris* (1969), 43 Ill. 2d 124, 131; *People v. Madden* (1978), 57 Ill. App. 3d 107, 115.) To insure that sentencing was proper, we have examined the sentencing and other related proceedings in their entirety.

At sentencing the trial judge expressly noted his consideration of the statutory aggravating and mitigating factors and his findings with respect to each of the statutory mitigation factors. The judge further noted that there were no mitigating factors sufficient to preclude death.

In addition to considering the appropriate aggravating and mitigating factors, the court considered the levels of participation of each defendant in the commission of this offense. In that regard, the court remarked that it disbelieved that defendant stood idly by while his codefendant cut the throat of the victim. The court noted that defendant had been directly involved in the planning of the act and that the medical testimony revealed that during the commission of the crime, defendant had totally brutalized the victim on three occasions. Further the court noted that defendant was present during the commission of the acts and that he was "holding Mrs. Nussel's head by your own statement, held her head back. You would have this court believe that somehow Mr. Kinkead appeared out of nowhere and sliced her throat and you had nothing to do with that. The reasonable inference I can draw from it is that you certainly could have in some manner at least attempted to prevent if you so desired. I don't think you had any desire to do so."

We perceive no misapprehension on the part of the court concerning the role each defendant played in the commission of the charged offense. The court considered the appropriate factors as well as the facts and circumstances surrounding the offense. The fact that the court may have determined each defendant's blameworthiness in bringing about the victim's death to be equal does not support a finding that the court's sentencing considerations were improper. Significantly, defendant was not convicted of intentional murder, a fact evidencing the court's clarity concerning defendant's mental state.

As in his post-trial motion, defendant asserts here that he is less culpable than Kinkead. Therefore, he maintains that he is entitled to a new sentencing hearing. He invites our attention to *People v. Szabo* (1983), 94 Ill. 2d 327, *People v. Ashford* (1988), 121 Ill. 2d 55, and *People v. St. Pierre* (1992), 146 Ill. 2d 494, for the proposition that this court has consistently held that the person among codefendants who actually inflicts the injuries resulting in death is the more culpable. Defendant then urges that because Kinkead actually cut the victim's throat, Kinkead was the more culpable defendant.

We reject defendant's argument. In the first place, that Kinkead had the more culpable mental state does not support a conclusion that defendant's participation and involvement in the commission of this offense was less than Kinkead's. Given the circumstances surrounding the victim's death, and defendant's participation, particularly, tilting back the victim's head, we are not inclined to disagree with the trial court's assessment of blame.

Secondly, this court has not announced in the cases cited a general rule that the defendant who strikes the fatal blow is the more culpable. True, in all three cases, *Szabo, Ashford,* and *St. Pierre,* those defendants who

happened to have inflicted the fatal injuries were determined to have been more culpable than their codefendants. However, that factor is not necessarily determinative of relative culpability. *People v. Gleckler* (1980), 82 Ill. 2d 145, is instructive.

In *Gleckler*, it was defendant Gleckler who had fired the fatal gunshots into the victims. On that basis, and in support of the death penalty, the State asserted that defendant Gleckler was the more culpable of the two defendants. This court rejected the State's contention. Notwithstanding defendant Gleckler's acts, the court noted that Gleckler's codefendant was the ringleader, that defendant Gleckler had the personality of a doormat and, further, that he might have been compelled to act by his codefendant.

We perceive no unfairness in the trial court's sentencing considerations.

· Factors in Mitigation of Death

Defendant next offers that the record does not "bespeak a hardened criminal beyond the hope of redemption or rehabilitation, or of a man possessed with a heart so malignant that death is the appropriate punishment." He raises several issues which purportedly support the conclusion that death is an inappropriate punishment. He entreats us, therefore, to vacate his sentence and remand for imposition of an appropriate penalty.

"Imposition of the death penalty requires an individualized assessment of the circumstances and character of the offender and the offense." (*People v. Tye* (1990), 141 Ill. 2d 1, 29, citing *Eddings v. Oklahoma* (1982), 455 U.S. 104, 110-12, 71 L. Ed. 2d 1, 8-9, 102 S. Ct. 869, 874-75.) In our review of the appropriateness of a sentence a necessary consideration is "whether the circumstances of the crime and the character of the defendant are such that the deterrent and retributive functions of the

ultimate sanction will be served by imposing the death penalty." (*People v. Johnson* (1989), 128 Ill. 2d 253, 280.) Where it is determined that a sentence is inappropriate or excessive, in light of the facts and circumstances of the particular case, this court has authority to vacate that sentence. See 134 Ill. 2d R. 615(b)(4); *People v. Turner* (1993), 156 Ill. 2d 354, 359; see also *Gleckler*, 82 Ill. 2d 145.

Notwithstanding our power to alter sentences, such authority should be exercised with considerable caution and circumspection. (*People v. Taylor* (1965), 33 Ill. 2d 417, 424.) Our power, and indeed, any inclination, to act is necessarily tempered by a clear recognition of the trial court's ordinarily superior opportunity in the course of trial and hearing in aggravation and mitigation to make a more sound determination concerning the punishment to be imposed than the reviewing court. (*Turner*, 156 Ill. 2d at 359.) That said, we consider defendant's several arguments in support of vacatur.

Defendant first argues that he did not intend to kill the victim. He had, instead, merely hoped to render her unconscious and then take her purse.

Defendant was convicted of and sentenced for felony murder. A "distinctive characteristic of felony murder is that it does not require an intention to kill." (*People v. Viser* (1975), 62 Ill. 2d 568, 581.) Under the felony-murder rule a person may be convicted of felony murder even though he had no intent to and even if he did not personally kill the victim. (See *People v. Connolly* (1965), 33 Ill. 2d 128, 133; see *People v. Burke* (1980), 85 Ill. App. 3d 939, 941.) Felony murder suffices as an aggravating factor for imposition of the death penalty. See Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(6).

In a related argument, defendant asserts that his research discloses no case in which a defendant who did not kill the victim had been sentenced to death for

felony murder based on section 9—1(b)(6) of the Criminal Code of 1961.

Section 9—1(b)(6)(a)(ii) (defendant is eligible for death if he inflicted injuries substantially contemporaneous with the injuries which caused the victim's death) is the statutory aggravating factor relied upon by the State to establish defendant's eligibility for the death penalty. (See Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(6)(a)(ii).) The trial court found the State proved this factor beyond a reasonable doubt, and defendant makes no contrary assertion. It is irrelevant, even if true, that no other defendant has been sentenced to death based on the presence of this factor. Such a fact cannot mitigate against death.

Defendant next sets out certain conduct of his codefendant, apparently for the purpose of demonstrating that defendant was the less culpable and, therefore, deserving of a penalty less than death. Defendant asserts the following. He and Kinkead searched for a victim in Kinkead's car, which was driven by a third defendant, Kinkead's girlfriend, Tara Poppenhager. It was Kinkead who armed himself with a knife, slashed the victim's throat, divided up the proceeds from the robbery and disposed of the knife.

We have reviewed defendant's statement concerning the events that transpired on the date of the offense. Defendant's statement of his involvement in the offense, which is not entirely consistent with the facts as now presented here, does not support a conclusion of lesser culpability. It appears, based upon a review of defendant's statement, that the plan was conceived jointly, with defendant taking the initial steps in its commission. Significantly, it was defendant who attempted to incapacitate the victim and then held her in a prone position on the floor, with her "head tilted," allowing for the delivery of the fatal wound. Further, it was defen-

dant who, by his own statement, took the purse and the money found in the small box from the victim's home. Finally, defendant played an equal role with Kinkead in the division and distribution of the proceeds of the crime.

Defendant next cites to a series of factors revealed in the presentence investigation which, he asserts, support the imposition of a lesser penalty. Initially he notes that he had a serious problem with drug and alcohol abuse and a very difficult childhood and adolescence.

The trial court considered these factors, but apparently found them insufficient to mitigate against death. Specifically, at sentencing the trial court stated that it had reviewed the presentence investigation "time and time again." The court stated that "there is no question when I look at the pre-sentence investigation that your life as a child and young adult was and has been extremely difficult." With respect to the drug and alcohol abuse, the court noted, "I look at the pre-sentence investigation as far as your *prior* drug and alcohol abuse and think well there is obviously a problem here and maybe this Court should find or attempt to find some way to help you, yet I note in 1987 the Fulton County Circuit Court as a condition of your probation attempted to help you with this and you failed to take advantage of that." (Emphasis added.) We note additionally that the presentence report indicates that defendant stated that he was under the influence of alcohol, but not drugs, at the time of this offense.

Defendant next argues that he felt remorse for his acts and points to the testimony of his Aunt Sally, as well as a poem offered in allocution.

The trial court reached a contrary conclusion. In that regard, the court stated, "I have watched you through nine plus months of numerous court proceed-

ings in these cases and the only time that I have ever perceived any emotion whatsoever on your part was when your aunt, Sally was testifying this morning about your mother. Now you have written this poem explaining how sorry you are. But until today I have never seen it. *** I just haven't seen any remorse."

Defendant finally asserts that defendant had no history of violent crime. Regarding defendant's criminal record, the court noted that from the time defendant turned 17 years of age, over a four-year period, there were 13 convictions, mostly for minor offenses. In each case where defendant was given probation, however, he failed to complete the terms of that probation by committing yet another criminal offense. The court further noted that defendant's criminal history progressed from relatively minor cases to a residential burglary, for which he was sentenced to five years' imprisonment. It was shortly after his release for that offense that defendant committed this present offense. The court additionally stated that it had seen no indication that defendant could be rehabilitated.

We have examined the presentence report which chronicles defendant's history of criminal activity. True, defendant has not, heretofore, engaged in particularly violent crime. (Between 1986 and 1989, defendant had two convictions for damage to property, four convictions for trespass to vehicles, one conviction for disorderly conduct, two convictions for battery, one conviction for residential burglary, and several convictions for unlawful consumption of alcohol.) However, the trial court considered defendant's criminal background and the nature of those offenses. The court apparently believed that the relative nonviolence of those offenses was insufficient to mitigate against death.

Defendant's last argument in support of a lesser punishment focuses on cases in which this court has

vacated the defendant's death penalty sentence. He asserts that this court has found defendants who have committed far more serious acts of violence than this defendant to be undeserving of the death sentence and have vacated their sentences. Citing to *People v. Carlson* (1980), 79 Ill. 2d 564, *People v. Buggs* (1986), 112 Ill. 2d 284, and *People v. Gleckler* (1980), 82 Ill. 2d 145, defendant seeks comparable consideration.

This court has, on previous occasions, considered whether a sentence of death in a particular case is disproportionately harsh in comparison with a less severe sanction imposed on a codefendant convicted of the same crime. (See *People v. Kitchen* (1994), 159 Ill. 2d 1, 44 (and cases cited therein).) However, comparative proportionality review is not required either by the Federal Constitution (*Pulley v. Harris* (1984), 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871) or by our death penalty statute (*People v. Tenner* (1993), 157 Ill. 2d 341, 389). "[P]ersons who commit crimes independently are seldom, if ever, similarly situated." *People v. Conaway* (1981), 101 Ill. App. 3d 202, 204.

Nevertheless, we have reviewed those cases cited by defendant and find them factually distinguishable from this case. In each case it was the presence of some provocative, precipitating factor and/or the absence of a significant history of prior criminal activity which mitigated against death. (See *Carlson*, 79 Ill. 2d 564 (defendant acted under extreme emotional disturbance); *Buggs*, 112 Ill. 2d 284 (defendant's conduct generated by extreme marital disharmony); *Gleckler*, 82 Ill. 2d 145 (defendant determined to have the personality of a doormat who acted under compulsion of his ringleader codefendant).) The facts in this case do not compare favorably with either *Carlson*, *Buggs* or *Gleckler*. Thus, these cases can provide no support for vacatur of defendant's death sentence.

In sum, we have considered the record of these proceedings in its entirety. We have closely examined defendant's inculpatory statement, as well as the presentence report. Additionally, we have considered the circumstances of this crime and the character of the defendant. Other than his urging that a lesser sentence is appropriate, defendant offers no valid reason to alter the result in this case.

One of the most arduous tasks facing a sentencing judge is the fixing of an appropriate sentence. The burden is no less weighty in the context of a capital case. Here, the trial court's imposition of the death penalty came only after solemn deliberation. The sentence was noticeably well considered, with the proper focus given to the nature of the offenses and the character of this defendant, as well as his rehabilitative potential. We find no fault with the trial court's sentencing determination.

## CONSTITUTIONALITY OF THE DEATH PENALTY STATUTE

The remainder of defendant's arguments on appeal challenges the constitutionality of the Illinois death penalty statute. Defendant first contends that the statute is violative of the eighth amendment because it places a burden of proof on the defendant which precludes meaningful consideration of mitigation. He argues that after requiring a determination that a specific aggravating factor has been proven beyond a reasonable doubt, making death, therefore, possible, the statute then suspends the rules of evidence and requires the sentencer, in light of mitigation evidence presented, to determine whether death is not possible. "Because a thing cannot be simultaneously possible and impossible, it follows from such a scheme that only judges and jurors who refuse to follow the law will fail to sentence death eligible defendants to that penalty."

This exact challenge has been considered and rejected by this court on at least two separate occasions. (See *People v. Mitchell* (1992), 152 Ill. 2d 274, 345-46; *People v. Hampton* (1992), 149 Ill. 2d 71, 116-17.) Absent some valid basis for reconsideration, we decline to do so.

Defendant's second challenge to the death penalty statute is that it does not sufficiently minimize the risk of arbitrarily or capriciously imposed death sentences. He acknowledges that this court has "separately" addressed and rejected various challenges to the death penalty, including prosecutorial discretion to seek capital punishment (see *People v. Davis* (1983), 95 Ill. 2d 1, 22), the absence of pretrial notice that capital punishment will be sought (see *People v. Silagy* (1984), 101 Ill. 2d 147, 161-62), the absence of limited comparative proportionality review of death sentences (see *People v. King* (1986), 109 Ill. 2d 514, 551), the manner in which prosecutors may exercise discretion to seek the death penalty (see *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 535-43), the absence of written findings by the sentencer (see *People v. Kubat* (1983), 94 Ill. 2d 437, 504), the absence of a requirement limiting evidence of aggravation to that made known to the defendant prior to trial (see *People v. Albanese* (1984), 104 Ill. 2d 504, 540-41), the absence of a burden of proof on the prosecution (see *People v. Garcia* (1983), 97 Ill. 2d 58, 80-82), that phraseology may lead the sentencer in a particular case to place the burden of proof on the defendant (see *Tenner*, 157 Ill. 2d at 390), and preclusion of the sentencer's consideration of the exact range of sentences applicable if death penalty is not imposed (see *People v. Albanese* (1984), 102 Ill. 2d 54, 81). He, nonetheless, urges our reconsideration of these several issues, "collectively," to determine whether, in their totality, these "features and omissions" render the statute unconstitutional.

This court has previously stated that individual portions of the death penalty which have been previously upheld as constitutional do not collectively function to make our sentencing scheme unconstitutional and arbitrary. (*People v. Gosier* (1991), 145 Ill. 2d 127, 165.) "If all of the individual aspects are constitutional, we stand by the conclusion that the whole is also constitutional." (*People v. Phillips* (1989), 127 Ill. 2d 499, 542-43; *People v. Ward* (1992), 154 Ill. 2d 272, 346.) Defendant offers no new basis for our reconsideration of this issue. We therefore decline to do so.

## CONCLUSION

We have carefully considered the sum of defendant's arguments on appeal. For all of the foregoing reasons, we affirm defendant's convictions and sentence. The clerk of this court is directed to enter an order setting Tuesday, January 17, 1995, as the date on which the death sentence entered in the circuit court of Mason County is to be carried out. Defendant shall be executed in the manner provided by law (Ill. Rev. Stat. 1991, ch. 38, par. 119—5). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden at Stateville Correctional Center, and the warden of the institution in which the defendant is confined.

*Affirmed.*

JUSTICE HARRISON, dissenting:

Although the majority correctly states *Strickland*'s two-part test for assessing claims of ineffective assistance of counsel, it forgets that these principles are not intended to be mechanical rules. According to the United States Supreme Court,

"the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether,

despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Strickland*, 466 U.S. at 696, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

During the guilt phase of this case, the breakdown of the adversarial process was total. At the time defendant pleaded guilty, his attorney had completely abandoned his responsibilities as an advocate. When counsel urged defendant to waive a trial without first attempting to obtain a concession on sentencing, the only interests he served were those of the State's Attorney, whose office he had once held. There was no possible benefit to his client.

Where an attorney believes that his client's best chance lies with a trial on the merits, there may be legitimate reasons for forgoing plea negotiations. Where, however, counsel recommends that a client facing the death penalty forgo a trial, the failure to even explore the possibility of negotiating concessions can never be justified.

No matter how strong the evidence or how weak the possible defenses, every defendant has at least one bargaining point—the plea itself. (*Cole v. Slayton* (W.D. Va. 1974), 378 F. Supp. 364, 368.) There are always legitimate reasons the State may offer to negotiate for that plea, *e.g.*, saving the cost of trial, increasing efficiency in achieving convictions, and providing further flexibility in the criminal process. (*People v. Brown* (1986), 177 Cal. App. 3d 537, 546, 223 Cal. Rptr. 66, 71.) Although the State may refuse to agree to concessions in a particular case, a defendant in a capital case has nothing to lose by asking and everything to gain. It may spare his life. This is a concept even the most inexperienced lawyer should surely be able to grasp.

In rejecting defendant's claim, the majority asserts that the prejudice to him is too speculative. (162 Ill. 2d

at 481.) Such an assertion is meritless. To prove actual prejudice, a defendant need only show that a "reasonable probability" exists that, but for counsel's unprofessional errors, the result would have been different. A "reasonable probability" is not a certainty. It is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

This threshold was met here. There is no dispute that the State offered the codefendant a plea agreement which would have eliminated the possibility of a death sentence. Given that the codefendant was the one who actually inflicted the mortal wound, there is every reason to believe that defendant could have secured terms which were every bit as good, if not better. The majority gives no reason for concluding otherwise.

As an alternative basis for its decision, the majority excuses counsel's recommendation to enter a blind plea on the grounds that it was a matter of trial strategy. This contention must also fail. A strategy is a "careful plan or method." (Webster's Third New International Dictionary 2256 (1986).) Counsel's advice here was anything but that. It was not based on any past experience, special knowledge, or clever insight. There was no more reason behind it than buying a chance at the lottery. In effect, counsel was asking his client to close his eyes, cross his fingers, and hope for the best. Defendant could have done as well had he simply consulted the horoscope in the morning paper.

If advice like this is all the sixth amendment requires, as the majority holds today, the right to counsel is an empty promise. I believe the Constitution requires more. I therefore dissent.

JUSTICE McMORROW joins in this dissent.