2021 IL App (1st) 191620-U
Order filed: April 9, 2021

FIRST DISTRICT
FIFTH DIVISION

No. 1-19-1620

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 05911 |
| | ) | |
| MARVIN HIGGS, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Delort and Justice Hoffman concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Defendant's conviction for aggravated battery is affirmed, where the assertion that he was prejudiced by the trial court's consideration of improper hearsay and other-crimes evidence is unfounded.

¶ 2    Defendant-appellant, Marvin Higgs, appeals from his conviction for aggravated battery. For the following reasons, we affirm.[1]

¶ 3    Defendant was charged by indictment with one count of attempted murder and five counts of aggravated battery. In each count, it was alleged that defendant stabbed Paulino Flores on or

_____

1 In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order stating with specificity why no substantial question is presented.

about March 25, 2018. During pretrial discovery, defendant indicated that he would rely upon defense theories of self-defense and defense of others. The matter then proceeded to a bench trial held in June 2019.

¶ 4     At trial, Shawnta Brown testified that she and defendant were previously involved in a relationship, one that ended seven months after the birth of their son, Marvin Higgs, III. At the time of the stabbing, Brown and defendant were "co-parenting" a now 8-year-old Marvin, with Marvin visiting defendant on certain weekends. These visits were coordinated by Brown and defendant's mother, Lillian Hill.

¶ 5     On March 25, 2018, Brown traveled to defendant's home on the 700 block of North Throop Street in Chicago to pick up Marvin after one such weekend visit. Brown drove there with her boyfriend, Paulino Flores. Arriving shortly after 10 p.m., Brown informed Hill of her arrival and she and Flores waited in the car for a few minutes. Marvin then came outside to the car, accompanied by Hill and someone Brown only knew as "Uncle Willie." Brown testified that while it was not unusual for Hill to accompany Marvin to the car, Willie had never done so before.

¶ 6     Flores got out of the front passenger seat and walked around the car to open the rear door for Marvin, something he did every time he went with Brown to pick up Marvin. Brown then heard Willie's voice, followed by the voice of Flores, and then heard some commotion or struggle. Marvin began screaming, and Brown drove her car forward about 100 feet. When Brown looked back, she could see three or more people, but could not tell who any of them were other than Flores.

¶ 7     A short time later, Flores walked toward the car and told Brown that he was bleeding. After he got into the car, he told her he had been stabbed. Brown drove Flores to Norwegian American Hospital. During the trip, Flores was "dazed, in and out" and "looked like he was dying right

there." Flores was initially treated at Norwegian American Hospital but had to be transferred to Stroger Hospital due to the extent of his injuries. The police arrived while Brown was at Norwegian American Hospital, and she gave them permission to search her car.

¶ 8     Brown testified that she never observed Flores with a gun or any other weapon on the night of the stabbing. She did note that she had a purse full of tools in the car, including a hammer wrapped in black tape. She explained that she and Flores had used the tools to complete an oil change on the car earlier in the day. Brown never saw Flores with the hammer during the incident, and she testified that she never told police detectives about the hammer because they never asked.

¶ 9     Flores testified, and began by acknowledging that he had a 2008 conviction for robbery and a 2009 conviction for manufacture and delivery of a controlled substance. With respect to the incident, Flores got out of the car when he saw Marvin coming out to the sidewalk, something he always did when he accompanied Brown to pick up Marvin. Flores noted that Marvin was accompanied by Hill, which was not unusual. But he also noticed Willie, which was unusual. Flores had never met Willie before but knew who he was from family photos he had seen in Marvin's bedroom.

¶ 10     Before exiting the car, Flores tucked a hammer wrapped in black tape into the front of his waistband. He had retrieved the hammer from a purse of tools Brown kept in the car to complete oil changes, a task he and Brown had completed earlier in the day. When asked why he took the hammer when he got out of the car, Flores responded:

> "Because there had been a series of – Okay. So when the son goes over there on the weekend, he always come back and tell us how his weekend was and he would tell that his father would make threats towards me and Shawnta. And Shawnta had already told me that previously in her relationship with him that he was real, you know, violent with her as far

as physically and emotionally. So I felt, like, you know it's possible something, you know, would happen. They would try to do something to her or him or the little one."

Flores also noted that he was suspicious of Willie, who had never brought Marvin out to the car before.

¶ 11     As Flores came around the car and opened the door for Marvin, Willie came off the porch and said, "what your bitch ass getting out of the car for?" The two men then went "back and forth" verbally until Willie threw a punch that Flores deflected. They then began wrestling and tussling and fell to the ground. As Willie was trying to pull Flores' hoodie over Flores' head, Flores felt a sting in his leg and then observed defendant swinging his arms and stabbing him. Shortly thereafter, Flores was able to get up off the ground and observed defendant, Willie, Hill and a man Flores later learned was defendant's father. Believing his life was in danger, Flores took out the hammer at this point, which previously had remained concealed in his waistband. Flores did not raise the hammer or advance on anyone with it, but rather asked defendant why he had been stabbed. Defendant did not respond, instead he simply looked at Flores "crazy like."

¶ 12     Defendant's father tried to deescalate the situation, Flores gathered his belongings, and made his way to Brown's car up the street. Flores spent three or four days at Stroger Hospital being treated for 10 stab wounds, wounds which resulted in scarring still visible at the time of trial. Flores did not mention the hammer to police when he was interviewed in the hospital because he "wasn't thinking about it" and "never used it as a weapon." Flores did tell the police about the hammer later when he was interviewed at Brown's home and informed of surveillance footage of the incident, at which time he also identified defendant and Willie in separate photo arrays.

¶ 13     The State then presented two video clips of the incident that were captured by a security camera on a neighboring property, pursuant to a stipulation. Flores narrated the details of the

incident again as depicted in the videos. Finally, Flores reiterated that he had never met defendant before the incident, never wielded the hammer as a weapon, and was never in possession of a firearm during the incident.

¶ 14    Chicago police officer Gonzalez, who did not provide his first name at trial, testified that he responded to Norwegian American Hospital on the night of the incident. There he was able to speak to Brown and obtained her consent to search her car. Looking for a firearm, no firearm, knife or other weapon was recovered.

¶ 15    Chicago Police Detective Scott Brownley was assigned to investigate this incident and responded to the scene before moving on to Stroger Hospital. He was unable to speak to Flores at that time, but he did speak to Brown who provided defendant's name. Brownley was able to talk to Flores two days later, at which point Flores described the incident. Based upon that conversation, photo arrays were prepared, and defendant subsequently identified defendant and Willie. Brownley also obtained surveillance video from a nearby building. An investigative alert for defendant was issued, and defendant was arrested on April 6, 2018.

¶ 16    Brownley and his partner interviewed defendant the following day. In that interview defendant said he heard yelling outside after Marvin left his home on the night of the incident. Defendant then went outside and saw Flores and Willie engaged in a physical altercation, and observed a large, silver handgun in Flores' hand. Defendant then stabbed Flores to protect Willie. Thereafter, Flores got up off the ground and began waiving the gun around. When defendant was confronted with the fact that surveillance footage did not appear to show a large, silver handgun, defendant reiterated that that is what he believed he saw.

¶ 17    Finally, Brownley specifically recalled that Flores told him he used the hammer to change oil in Brown's car but could not recall Flores ever saying that he used the hammer for protection.

¶ 18    Defendant's motion for a directed verdict was denied, and he took the stand in his own defense.

¶ 19    Defendant testified that he was in his home on March 25, 2018, when Brown came to pick up Marvin. Hill took Marvin downstairs and defendant's uncle, Willie Hill, went with them because he happened to be leaving at the same time. After they went downstairs, defendant heard loud screaming and ran downstairs. He saw Flores on top of his uncle "in a wrestling type, fighting."

¶ 20    Defendant ran over and started punching Flores and yelling, "get off my uncle." He saw Flores use his right hand to reach for his waistband and defendant said, "he got a gun." Defendant described the gun as having a black handle with silver at the top. Defendant feared that Flores would harm his uncle, his mother, or him, so he pulled a four-inch switchblade knife from his pocket and started stabbing Flores "like five, six times." Defendant's mother joined in on the fight, kicking and punching Flores. Defendant stopped stabbing Flores when Flores let go of Willie.

¶ 21    Flores then got up and "pulled the gun out," raised his right hand in a pointing fashion about chest high and pointed it at defendant for a couple seconds. The gun was not a hammer wrapped in black tape. The video of the incident was played again during defendant's testimony.

¶ 22    Following closing arguments, the trial court found defendant not guilty of attempted murder, but guilty on each of the five counts of aggravated battery. In doing so, the trial court rejected the defense theories of self-defense and defense of others. Specifically, the trial court summarized:

> "On balance Mr. Flores and Ms. Brown, their stories seem consistent and they seem logical and I do believe them and the testimonies of the officers—or Officer Gonzalez and Detective Brownley. Also I believe Mr. Flores and Ms. Brown's account.

Mr. Higgs, the defendant, testified in his case in chief *** and I frankly did not believe Mr. Higgs. His testimony was inconsistent with the video on many, many key points here. For some of the reasons I've already stated of what the video showed. Mr. Higgs' account was not believable. This was not a self-defense case. There's not an issue of a reasonable belief of self-defense because there was no self[-]defense. Mr. Higgs' testimony is simply not believable.

Now, I certainly believe that the State has proven beyond a reasonable doubt the offenses of aggravated battery, all counts of aggravated battery."

¶ 23    Defendant's motion for a new trial was denied, and the trial court subsequently merged his five convictions and sentenced defendant to three years' imprisonment for aggravated battery. A motion to reconsider that sentence was denied, and defendant timely appealed.

¶ 24    On appeal, defendant first contends that the trial court erred by allowing the State to introduce improper hearsay and other-crimes evidence at trial. Specifically, defendant asserts that it was improper for the State to introduce Flores' testimony explaining why he brought a hammer with him when he walked around the car to open the door for Marvin, because that testimony included Flores' assertion that defendant had previously made numerous threats against him and Brown to Marvin and that Brown had told Flores that defendant had previously been emotionally and physically violent towards her. Defendant contends that both allegations were improper hearsay concerning evidence of other crimes, and improperly portrayed defendant as a threatening and violent person. These allegations purportedly prejudiced defendant at trial by influencing the trial court's consideration of his affirmative defenses of self-defense and defense of another.

¶ 25    Acknowledging that he failed to preserve this issue with an objection at trial and by raising it in his posttrial motion, defendant asks this court to review it for plan error. *People v. Enoch*, 122

Ill. 2d 176, 186 (1988) (to preserve a claim for review, a defendant must both object at trial and include the alleged error in a written posttrial motion).

¶ 26    The plain error doctrine "bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error." *People v. Herron,* 215 Ill. 2d 167, 186 (2005). The plain-error doctrine is applied where "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski,* 225 Ill. 2d 551, 565 (2007). In either circumstance, the burden of persuasion remains with the defendant. *Herron,* 215 Ill. 2d at 182. Here, defendant only asserts plain error under the first prong of the plain-error doctrine. We begin a plain-error analysis by determining if there was reversible error in the first instance, as "[a]bsent reversible error, there can be no plain error." *People v. Cosby*, 231 Ill. 2d 262, 273 (2008).

¶ 27    With respect to defendant's hearsay claim, we note that hearsay is defined as testimony of an out-of-court statement offered to establish the truth of the matter asserted therein, which rests for its value on the credibility of the out-of-court asserter. *People v. Evans*, 373 Ill. App. 3d 948, 964 (2007). A statement offered for a reason other than for the truth of the matter asserted is generally admissible because it is not hearsay. *Id.* For example, a statement offered to prove its effect on the listener's state of mind, or to show why the listener acted the way he did, is not hearsay. *Id.*

¶ 28    We review the trial court's decision regarding the admission of the alleged hearsay for an abuse of discretion. *People v. Anderson*, 2017 IL App (1st) 122640, ¶ 50. The trial court's decision

constitutes an abuse of discretion when its ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court. *Id.* ¶ 51.

¶ 29 Here, the record is clear that the testimony defendant challenges on appeal was not offered for the truth of the matters asserted therein, *i.e.*, that defendant had *actually* made numerous threats against Flores and Brown and had been emotionally and physically violent towards Brown. Rather, the testimony was only elicited to show why Flores acted the way he did in bringing the hammer when he walked around the car to open the door for Marvin. Such testimony offered for such a purpose is simply not inadmissible hearsay. *Evans*, 373 Ill. App. 3d at 964.

¶ 30 As to defendant's other-crimes claim, such evidence "is admissible if it is relevant for any purpose other than to show the defendant's disposition or propensity to commit crime. [Citation.] Examples of relevant purpose include *modus operandi,* intent, identity, motive, or absence of mistake. [Citation.] The list is not exclusive" *People v. Bedoya*, 325 Ill. App. 3d 926, 937 (2001). "The admissibility of other-crimes evidence is committed to the sound discretion of the trial court, and its decision will not be disturbed absent a clear abuse of discretion." *People v. Null*, 2013 IL App (2d) 110189, ¶ 43.

¶ 31 Here, we are unconvinced that the challenged testimony in fact constitutes other-crimes evidence. As noted above, typically a party would introduce such evidence to *prove* that a person *actually committed* another crime, where proof of the commission of such other crime would be relevant to a non-exclusive list of other purposes including *modus operandi,* intent, identity, motive, or absence of mistake. *Bedoya*, 325 Ill. App. 3d 937. Here, the State made no attempt to prove that defendant actually made numerous threats against Flores and Brown and had been emotionally and physically violent towards Brown, nor did the State then attempt to use proof of such conduct for some other relevant purpose. Rather, Flores' challenged testimony was

specifically elicited *not* to actually prove defendant's prior conduct, but to show why Flores acted the way he did. As discussed above, this was entirely proper.

¶ 32    Having found no reversible error with respect to this issue, we conclude that there can be no plain error. *Cosby*, 231 Ill. 2d at 273.

¶ 33    Defendant next contends that his trial counsel provided ineffective assistance of counsel in failing to object to the testimony he now challenges on appeal. We disagree.

¶ 34    A claim of ineffective assistance of counsel is judged according to the two-prong test established in *Strickland v. Washington,* 466 U.S. 668 (1984). See *People v. Lawton,* 212 Ill. 2d 285, 302 (2004). To obtain relief under *Strickland,* a defendant must prove defense counsel's performance fell below an objective standard of reasonableness and that this substandard performance caused defendant prejudice by creating a reasonable probability that, but for counsel's errors, the trial result would have been different. *People v. Wheeler,* 401 Ill. App. 3d 304, 313 (2010). The defendant must establish both prongs of this two-part test (*People v. Edwards,* 195 Ill. 2d 142, 163 (2001)), and the defendant bears the burden of demonstrating he received ineffective assistance of counsel (*People v. Valladares,* 2013 IL App (1st) 112010, ¶ 52).

¶ 35    It must be also be noted that effective assistance of counsel refers to competent, not perfect, representation. *People v. Palmer,* 162 Ill. 2d 465, 476 (1994). Thus, a petitioner must overcome the presumption that the challenged conduct might be considered sound trial strategy under the circumstances. *People v. Mims,* 403 Ill. App. 3d 884, 890 (2010). An evaluation of counsel's conduct cannot extend into matters involving the exercise of judgment, trial tactics, or strategy. *People v. Penrod*, 316 Ill. App. 3d 713, 722 (2000). A defense counsel's decision not to object to testimony involves a matter of trial strategy that will typically not support an ineffective assistance of counsel claim. *People v. Theis*, 2011 IL App (2d) 091080, ¶ 40.

¶ 36     "Reviewing courts should hesitate to second-guess counsel's strategic decisions, even where those decisions seem questionable." *Manning*, 241 Ill. 2d at 335. We review claims of ineffective assistance of counsel *de novo*. *People v. Demus*, 2016 IL App (1st) 140420, ¶ 21.

¶ 37     As an initial matter, we have already determined that defendant has demonstrated no error on appeal with respect to the introduction of the challenged testimony. As such, an objection on the grounds now raised on appeal would have been futile, and the failure to make such an objection cannot support a claim of ineffective assistance of counsel. See *People v. Mercado*, 397 Ill. App. 3d 622, 634 (2009) ("Defense counsel is not required to make losing motions or objections in order to provide effective legal assistance .").

¶ 38     We also reiterate the highly deferential standard we apply to challenges to a defense counsel's decisions involving what evidence to present and whether to make an objection. *Supra*, ¶ 35. Here, while defendant challenges his defense counsel's failure to make an objection to Flores' testimony, he makes no assertion that he was deprived of a meaningful adversarial proceeding and the record does not support such a finding.

¶ 39     Moreover, the record reveals that the failure to object to the challenged testimony was part of a broader trial strategy and was intended to provide evidence to support defense counsel's attempt to discredit Flores' overall testimony. Allowing Flores to testify that he brought the hammer for protection enabled defense counsel's subsequent attempts to impeach Flores with evidence that: (1) Flores only told police about the hammer when confronted with the fact that surveillance video showed him holding a dark object, (2) Brownley recalled that Flores told him he used the hammer to change oil in Brown's car but could not recall Flores ever saying that he used the hammer for protection, and (3) despite defendant's purported threats, Flores never filed any police reports.

¶ 40    Even if we were to disagree with this strategy, it is well settled "that a reviewing court will be highly deferential to trial counsel on matters of trial strategy, making every effort to evaluate counsel's performance from his perspective at the time, rather than through the lens of hindsight." *People v. Perry*, 224 Ill. 2d 312, 344 (2007). A mistake in trial strategy or an error in judgment will not render representation constitutionally defective. *Id.* at 355-356. "Only if counsel's trial strategy is so unsound that he entirely fails to conduct meaningful adversarial testing of the State's case will ineffective assistance of counsel be found." *Id.* Again, defendant does not assert he was deprived of a meaningful adversarial proceeding, and the record does not support such a finding.

¶ 41    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 42    Affirmed.